## Horner *et al.* versus Watson *et al.*

1. Hays sold the coal under a tract of land to Horner, with certain privileges through his adjoining lands; he subsequently sold the coal under part of those lands to Watson. *Held*, that any privilege, &c., directly conferred by the deed of sale to Horner, or by necessary construction or implication arising from it, dominated any conflicting right in the conveyance to Watson.

2. The owner of a mine has a right to mine his coal in the ordinary way, whilst he does no injury to an adjoining mine, except that which arises necessarily from the removal of the coal. Per Stowe, J.

3. Such owner would not be liable for the collection and flow by such mining of subterranean water upon lower mines. *Id.*

4. The upper owner would be liable for such mining, whether in the ordinary way or not, as would introduce foreign water from the surface by reason of the roof falling in, which water would not have flowed in if the roof had remained undisturbed and compact after coal was removed. *Id.*

5. Horner, in excavating his coal, removed the "ribs"—composed of coal—which supported the roof of the mine, causing the surface to sink and

[Horner v. Watson.]

crack, so that water from the surface flowed into his mine, and thence into the mine of Watson. *Held,* that he was liable to Watson for any injury done by such flow of water, although resulting from the approved, established and customary practice of mining in that region and without negligence.

6. In this state a custom that in mining the owner may remove the "ribs" and allow the surface to sink, is not reasonable nor of sufficient continuance to be good.

7. A claim destructive of the subject of the grant cannot be set up by any usage.

8. Jones *v.* Wagner, 16 P. F. Smith 429, followed.

October 7th 1875.    Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON, and WOODWARD, JJ.

Error to the Court of Common Pleas of *Allegheny county :* Of October and November Term 1874, No. 231.

These were two actions on the case brought by Robert Watson and James Watson against Simpson Horner and John A. Wood. One was to June Term 1867 and the other to December Term 1870 of the court below. The parties were adjoining owners of coal mines in Baldwin township, Allegheny county. The cause of action in each, was the flooding the plaintiffs' mine with water, which, by the negligence of the defendants, was permitted to flow from their mine. The two actions were consolidated and tried as one.

James H. Hays was the owner of the surface land under which both mines were, and also of adjacent coal land.

On the 12th of August 1853, Hays entered into an agreement with Simpson Horner and J. D. Hyatt (whose title the defendants have), by which Hays agreed to sell to them all the mineral coal comprising an area of 120 acres lying in and under a piece of land in Baldwin township, adjoining lands of Linhart's heirs on the south, and other lands of Hays on the east, north and west, with the right and privilege to Horner and Hyatt to enter " forthwith on the lands of Hays overlying and adjacent thereto, for the purposes of mining, excavating and removing said coal, and also a sufficient right of way * * * over and through the lands of said Hays on the lower side of Beck's run from the pit's mouth to the Monongahela river for the transportation of said coal," with privilege of a landing for twenty years, * * * also, the further privilege of driving and excavating such entries through the adjoining lands of the said Hays as may be required by them for ventilation and drainage of their pits and mines, without charge for the coal necessarily removed by them in the operation ; the said Hays, however, reserving the like privileges of driving and excavating entries through the coal hereinbefore described of the said (Horner and Hyatt) for the like purposes for the use of his own mines upon the adjoining lands now owned by said Hays, and also the right of retaining such of the entries of (Horner and Hyatt) as he may desire to preserve, making however a rateable abatement for the amount

of coal left for their support, and the amount removed by himself in the exercise of the privilege of driving the entries aforesaid through the coal of (Horner and Hyatt) from the purchase-money hereinafter stipulated to be paid at the rate of $500 per acre for the amount thus retained." * * *

The defendants opened their mines in August or September 1853.

On the 10th of September 1856 Hays sold to the plaintiffs a piece of coal land adjoining that of the defendants' on the westerly side.

The plaintiffs commenced to mine in March 1857.

The case was tried, February 26th 1874, before Stowe, J.

The plaintiffs' evidence was that they continued to work at the mine until early in 1861, when in consequence of the great depression of the coal trade they ceased mining until the spring of 1863. The defendants also stopped mining, but began three or four months before the plaintiffs. There was no trouble to the plaintiffs' mine about water until the year 1864, when the water came in from defendants' mine so as to interfere with plaintiffs' work in their mines, and continued increasing; plaintiffs procured a steam pump, which for some time relieved them; they agreed with defendants that the latter should pump the water, using plaintiffs' pumps; they neglected to pump and the water increased very much; when remonstrated with by plaintiffs, defendants refused to pump any more, saying that the coming in of the water was the act of God; plaintiffs afterwards made a drain at great expense to Beck's run. There was evidence further that the defendants had been taking down the "ribs" or pillars composed of coal; that in consequence the superincumbent surface sank and cracked; that the rain, melted snow, &c., ran through the breaks in the surface into the defendants' mine, and thence in great quantities into the plaintiffs' mines, which were lower than the defendants'. The plaintiffs gave evidence also of the expense to which they were put in freeing their mines from the water.

The defendants gave evidence that quantities of water would collect in all coal mines from the working of them, especially where there were veins of clay through the coal, as frequently was the case. They gave evidence also, for the purpose of showing that the water which flowed from their mines into the plaintiffs' was the result of the ordinary and proper working of their mines, and not the result of negligence or want of care. They gave evidence also that their mines were as well opened as any mines on the river; that it was proper mining, and the approved, established and customary manner of mining bituminous coal to take out the ribs or pillars without reference to its effect as to the sinking of the surface.

There was a great mass of testimony on each side.

The foregoing statements sufficiently present the case as considered and decided by the Supreme Court.

[Horner *v.* Watson.]

The defendants' second point, which was refused, was :—

Even if the jury should find that surface water found its way into defendants' mines, and thence into plaintiffs', the defendants would not be liable for damages therefor if the jury also find that the same was not occasioned by any wanton or wilful acts of the defendants, but was a natural consequence of their mining, and that they conducted their mining operations according to the approved, established and customary course and practice of mining in this region, and without any negligence in the operation of mining.

The court charged:—

" The owner of a mine has a right to mine his coal in any ordinary and reasonable way, so long as that does no injury more than that which necessarily arises by removing the coal, and such incidents as directly flow from such use. Thus, in the case of subterranean water percolating through the coal, or in cases of subterranean springs where the mere removal of the coal may cause the water to collect and flow toward or upon lower mines which might or would not otherwise do so, the owner of the higher mine is not responsible to the owner of the lower mine for the injury to him thus occasioned. But otherwise where the mining is done in such a manner (whether the ordinary way or not) as to introduce foreign water from the surface or higher level, by reason of the roof falling in, and thus introducing water from the surface which would not have flowed in if the roof of the mines had remained undisturbed and compact after the coal was removed. In other words, whatever water (if any), flows in from percolation or gravitation, simply by reason of the excavation or removal of the coal, the owner of the higher mine is not liable therefor. [But whatever water arose from the breaking in of the roof and the consequen; sinking or disturbance of the surface, thus occasioning an addi tional flow from above which would otherwise *not* have run in or upon the lower owner, the owner of the higher mine is responsible for whatever loss or expense the former fairly is put to to secure or protect his own property from injury from such water. This is the general rule without reference to actual negligence or want of skill on the part of the higher owner.] * * *

" 1. Was there any negligent or unskilful working of the mines of defendants ? To determine this question, you are to examine the evidence indicating whether or not they were worked in the ordinary and approved method of working mines similarly situated in the neighborhood of this mine, or in this general mining locality. If these mines were worked in the usual and approved method as above stated, there was no negligence which can avail the plaintiffs in this case as against the defendants. But if otherwise, then there was negligence; and if you so find, then you are to inquire whether such negligent or improper mining of defendants' coal increased the

[Horner *v.* Watson.]

flow of water upon plaintiffs, thereby throwing upon them water that otherwise would not have flowed upon them. If it did *not*, plaintiffs have no right to recover damages upon this ground. But if it *did*, then whatever additional water was thus thrown upon plaintiffs, defendants are liable in damages for the proper cost of removal by plaintiffs.

" 2. But there is another question involved in this case which is of great importance, and does not involve the question of actual negligence or want of ordinary care, nor the usual method of mining coal in this part of the country. That is, assuming that the coal was properly mined in accordance with the usual and approved manner, are the defendants liable for such water as flowed upon plaintiffs' from defendants' mine ?

" Upon this question it is alleged by defendants that water arising from the proper and ordinary working of the mines, such as *naturally* and *directly* resulted from removing the coal, flowed upon plaintiffs by reason of percolations, subterranean springs or natural flow by gravitation through the surface ground, without any disturbance of the roof or surface ground. For such water the defendants are not liable, for the law is in such case as this that it is the right of each of the owners of adjoining mines to work his own mines in the manner which he deems most convenient or beneficial to himself, although the natural consequence may be that some prejudice will accrue to the owners of the adjoining mines, so long as such prejudice does not arise from the negligent or malicious conduct of his neighbor.

" [But this is not all of plaintiffs' case. It is alleged, and evidence adduced which certainly tends to show, that water was introduced into defendants' mines from the surface, by reason of the drawing of ribs which are left to support the roof, or other acts of defendants letting down the roof or so disturbing the surface earth as that water flowed in that would not have otherwise done so. This is denied by defendants, and evidence adduced tending to show that no such water ever came into plaintiffs' mines which flowed from defendants'. This is a question of fact solely for you under the evidence. If you should find for defendants upon this point, then your verdict should be for them, if you find as before stated that the operations of defendants in their mining was carried on in the usual and approved manner. But if you should think that the evidence shows that such surface or other foreign water was thus (as alleged by plaintiffs) caused or allowed to flow into defendants' mines, and thence flow upon plaintiffs' mines, for such water the defendants are liable for whatever reasonable cost or expense plaintiffs were put to in removing the same from their mines, including the cost of ordinary or proper draining or machinery for that purpose."] * * *

The verdict was for the plaintiffs for $7100.

[Horner v. Watson.]

. The defendants took a writ of error and assigned for error: the answer to their second point and the part of the charge in brackets.

*M. W. Acheson*, for plaintiffs in error.—The plaintiffs should have left a sufficient rib of coal on the line between them and defendants which would have been effectual to prevent the water from coming in: Bainbridge on Mines 455. An owner of a coal mine may work it as is most advantageous to himself, although the natural consequence may be some prejudice to the adjoining owner: Smith *v.* Kenrick, 7 M., G. & S. 515; Bainbridge on Mines 460; Acton *v.* Blundell, 12 M. & W. 324; Kauffman *v.* Griesemer, 2 Casey 407.

*A. M. Watson*, for defendants in error, cited Smith *v.* Kenrick, Acton *v.* Blundell, *supra;* Baird *v.* Williamson, 109 Eng. Com. L. Rep. 388; Jones *v.* Wagner, 16 P. F. Smith 429.

Mr. Justice GORDON delivered the opinion of the court, January 6th 1876.

The rights of both the plaintiffs and defendants, who hold adjacent coal fields, are derived from a common grantor, James H. Hays. The title of the defendants ante-dates that of the plaintiffs, hence, it is not controverted but that any right or privilege, directly conferred, by the deed or articles of Hays to the vendors of the former, or which, by necessary construction or implication, arises therefrom, must dominate any conflicting right or privilege found in the conveyance to the plaintiffs. They must take subject to the precedent grant. If, then, the defendants, Horner, Wood & Co., had the right under their contract to withdraw all the coal found within their grant, without leaving any ribs, pillars or other supports to sustain the surface, it is clear that the subsequent vendees of the adjoining tract took subject to such right, and of the consequent falling in of the superincumbent land, and the intrusion of surface water into their works, they cannot complain. The whole question, which we are required to consider, is raised from that part of the charge of the learned judge of the court below, wherein, after stating that the owner of a mine has a right to mine his coal in an ordinary way so long as that does no injury more than what necessarily arises from the removal of the coal, and that he would not be liable for the collection and flow, by reason of such mining, of subterranean water upon lower mines, he adds : " But otherwise where mining is done in such a manner (whether the ordinary way or not) as to introduce foreign water from the surface or higher land, by reason of the roof falling in and thus introducing water from the surface which would not have flowed in if the roof of the mines had remained undisturbed and compact after the coal was removed." This was responsive to the

[Horner *v.* Watson.]

defendants' second point, which was negatived, which required the court to charge that the defendants were not liable for the introduction of such surface water, if not occasioned by the wilful and wanton acts of the defendants, but was a necessary consequence of their mining according to the " approved, established and customary course and practice of mining in this region, and without any negligence in the operation of mining." The defendants thus endeavored to put themselves upon an alleged custom of the country which permitted the withdrawing of all the supporting ribs and pillars of a coal mine and the consequent subsidence of the soil. Now, though in our opinion, the contract cannot in itself be so construed as to warrant a withdrawal of all surface support, yet if the custom contended for be established, it follows, that, in the absence of any provision to the contrary, it must govern and interpret the agreement of the parties, as it would be presumed they acted with reference to such custom in framing their compact. But the learned judge, who tried this case in the Common Pleas, refused to recognise any such custom ; in this we think he was right. This identical point was raised in the case of Jones *v.* Wagner, 16 P. F. Smith 429, where it was held, that of common right the mining right was servient to the surface to the extent of sufficient supports to sustain it, and that there could be no custom to the contrary. The reason given for this conclusion was that the business of mining in the western part of the state was of a date too recent to give such a custom the age necessary for its validity. We are willing however to go one step further and say, that the alleged usage lacks another essential feature of a good custom, and that is reasonableness. It is not reasonable that that which the law grants as of common right should, not merely be modified, but abrogated by custom or usage. When A. grants to B. a tract of land reserving the minerals under it, the legal presumption is that B. shall have and enjoy the exclusive and uninterrupted use of the surface, but if A. may, notwithstanding, under the plea of some general custom, dig out the foundations of the land and let down the surface, or render it so dangerous that it cannot be used, it is clear that he may thus destroy his own grant and invalidate the rights with which the law clothes his own vendee.

This court, in Jones *v.* Wagner, adopted the English decisions upon this subject, and as these decisions embody an experience in the business of mining much greater than our own, they are entitled to the greatest respect. So when we consider the super-eminent importance of this industry to the British Isles, we may be sure that the judiciary thereof would not wittingly deprive it of any of its just rights or privileges. Turning then to these decisions, we everywhere find that the plea of a custom which would warrant the withdrawal of a proper support to surface land, is treated as unreasonable and invalid. And first, with reference to the con-

[Horner v. Watson.]

struction of a contract such as that now under consideration, we have in the case of Harris v. Ryding, 5 M. & W. 60, a judicial exposition in point. In that case there was a grant of the surface with a reservation in the strongest possible terms of all and every part of the mines and minerals in the land. It was held, however, that the grantor could not withdraw all the coals without leaving a proper support for the surface; Baron Parke observing that by reasonable intendment, under the reservation, the grantor could only be entitled to so much of the mines below as would be consistent with the proper enjoyment of the surface. On the question of the validity of a custom tending· to affect such intendment, we have first the case of Hilton v. Lord Granville, 5 Ad. & El. (N. S.) 701. The declaration was in case, charging that the defendant dug his mines so near the plaintiff's premises as to crack the ground, &c. The defendant pleaded a prescription to take the coals under any messuages, buildings or lands in the manor, and without liability for damages that might occur in consequence of the taking thereof. Held, that such a prescription was void because unreasonable, and that a custom similarly pleaded was void for the same reason ; the objection being equally fatal to both. For a precedent for holding such custom bad, reference was had to the opinion of Willes, C. J., in Broadbent v. Wilks, Willes 360, in which it is said that the true objection to the custom pleaded was that it was uncertain and unreasonable—as it might deprive the tenant of the whole benefit of his land. Lord Denman, C. J., adds, that a claim destructive of the subject-matter of the supposed grant cannot be set up by any usage, "and that the prescription or custom here pleaded has this destructive effect and is so repugnant and void, appears to us too clear from the single statement to admit of illustration by argument." Not less destructive to the grantor's reserved rights would be the custom set up in the case in hand, for not only would it defeat any use which he might otherwise have of the reserved surface, but by introducing surface water, would be destructive of his adjacent mines. The next case to which we make reference is that of Humphries v. Brogden, 12 Ad. & El. (N. S.) 739. The plaintiff charged in his narr. that the defendant carelessly, &c., and without leaving any pillars or supports, and contrary to the custom of the country, in that behalf, so worked his mines as to crack open and to cause to subside the soil, &c. The plea was not guilty. The jury found the defendant had worked carefully and according to the custom of the country, but without leaving sufficient pillars or supports. A verdict was entered for the plaintiff for 110l. damages, with leave to move to enter a verdict for the defendant if the court should be of the opinion that, under these circumstances, the action was not maintainable. Held, the plaintiff was, on this finding, entitled to judgment ; for that of common right, the owner of the surface is

entitled to support from the subjacent strata. In delivering the opinion of the court, Lord Campbell, C. J., says: that if the owner of two adjacent closes should alien one of them, his alienee, without a grant to that effect, is entitled to lateral support *eo instante* the deed is executed as much as after twenty years or any longer period, and that *pari ratione*, where there are separate free-holds of the surface land and the mineral, the former is entitled to support from the subjacent strata. For if this be not as, the sur-face cannot be securely enjoyed as property, and that circum-stances are conceivable, as the great thickness of the minerals and their proximity to the surface, under which it would be rendered wholly worthless. He then comes to the conclusion that the rule, giving the right of support to the surface upon the minerals, in the absence of any express grant, reservation or covenant must be laid down generally without reference to the nature of the strata or the difficulty of propping up the surface or the comparative value of surface and mineral. The learned justice further adds: that he is not aware of any principle upon which qualifications could be added to the rule, and that an attempt to introduce them would lead to uncertainty and litigation. The case of Hilton *v.* Lord Granville was cited and approved as sustaining the doctrine that the custom therein contended for was void because unreasonable. The last case we have upon this subject is that of Blackett *v.* Bradley, 1 B. & S. 940.

In answer to the charge that they had wrongfully and without leaving proper supports, so worked their mines under the plaintiff's land as to cause it to fall in, the defendants pleaded title to the mines, under the said land, by virtue of the enclosure act, and, further, that from time immemorial up to the framing of said act, the lord of the manor and his assigns had been used and accus-tomed, as of right, to search for, win and work the mines under the commons without leaving any support for the lands under which the said were situate, &c., and that from the time of the pass-ing of the act the mines had been so worked without leaving any support, and that the defendants worked the mines under a lease thereof from the lord. On demurrer, it was held that the plea was bad; such a prescription having been held invalid in Hilton *v.* The Earl of Granville, 5 Q. B. 701. Wightman, J., said, during the argument of the demurrer to the fourth plea, which was framed under the Act of 2 & 3 W. 4, ch. 71, shortening the period of prescription: "If the custom is bad it cannot be made better under Lord Tenterden's Act." The whole case was finally dis-posed of on the authority of the case last above cited; Cockburn, C. J., remarking, that though some of the reasoning in that case had been overruled in the House of Lords in Rowbotham *v.* Wilson, yet the decision itself remained unaffected.

These authorities, then, teach us that in whatever shape the plea

[Horner v. Watson.]

for destruction of the surface right may come, whether as a prescription or custom, it is bad as tending to defeat the original grant. A distinction has been attempted between a grant of the surface by the owner of the whole fee, and a reservation thereof in his own favor as implied from the conveyance of the minerals alone. But this distinction is not sound. The right of support is *ex jure naturæ*, hence, as no doubt can arise as to its character, it cannot come within the category of those ambiguities which must be construed most favorably for the grantee and most strongly against the grantor. So the very point is met in Jones *v.* Wagner, by a citation from Rogers on Mining, p. 455, where it is said: "If an owner of lands grant a lease of the minerals beneath the surface with a power to work and get them in the most general terms, still the lessee must leave a reasonable support for the surface."

In conclusion we may say that we have carefully examined the article of agreement between James H. Hays and Horner and Hyatt, and find nothing therein contained which would take them out of the rule above stated, and that on the whole case we consider the rulings in the court below unexceptionable.

The judgment is affirmed.

WILLIAMS and MERCUR, JJ., dissent.