# Staunton

NANNIE A. KERR V. CLINCHFIELD COAL CORPORATION.

September 23, 1937.

Present, All the Justices.

The opinion states the case.

*S. H. & George C. Sutherland,* for the plaintiff in error.

*M. M. Heuser, A. K. Morison* and *W. L. Rush,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

The plaintiff in the trial court, who is the plaintiff in error in this case, owned the surface of a tract of land containing twenty-three acres in Dickenson county, Virginia, fronting on the west side of McClure river some 1,200 feet, and extending back from the river and up the mountain side a distance approximating 2,000 feet. Immediately between the river and the points where the ascent to the high land or mountain begins is a level bottom of width varying from 100 to 250 feet.

On this land are situated four houses. Three of them are owned by the plaintiff and one is owned by her daughter and son-in-law, John Cochran, though by agreement with the owners, which is recognized by the defendant in this suit, the plaintiff is entitled to sue for and recover such damages, if any, as may have been caused by the injuries alleged in the notice of motion for judgment.

The Cochran house has five rooms and a bath and a hot water heating system. It has a cement basement, is covered with composition shingles and is furnished with electric lights. The curtilage contains a smoke-house, barn, chicken house, garage and garden. This house was supplied with water conducted to it by water pipes, placed underground, which were connected with a concrete reservoir, which was the receptacle for the water coming from a spring located on the high land of the twenty-three acre tract some 1,350 feet from the Cochran house. The elevation of the reservoir and spring above the level ground is about 150 feet. The water was freestone—pure, clear and soft. It was free from any foreign or deleterious substances and the stream running from the spring was described as being about the size of a lead pencil. There is a hydrant in the yard, from which, at one time, the occupants of the other houses referred to got water for domestic purposes, including laundry uses. The volume of water which issued from this spring was sufficient to supply the needs of four or five families. There was another spring to the left and very near the one described. The water from both

of them, if conserved, would have been sufficient to supply eighteen or twenty families.

At the time of the events described in the notice of motion, and which are relied upon as a basis for this action, the pipe had been procured and placed on the ground, and partially installed to supply the three houses which were near the Cochran house. Sometime before the institution of this suit the plaintiff had had the unoccupied bottom land subdivided into twenty-eight lots of varying dimensions.

The defendant in the trial court, who is the defendant in error here, owned all the coal under the twenty-three acre tract and mined what is known as the Upper Banner seam to a point fifty or seventy-five feet, if it were on the surface, from the spring. In the fall of 1933 the defendant pulled the pillars, which were necessary as a subjacent support for the surface of the land. This caused large cracks or fissures two and three feet wide to appear in the land. The hill land was badly broken up and rendered unfit for use of any sort. It was reckoned by an engineer that four or five acres were totally destroyed so far as utility is concerned. The water from both springs was sunk, and, of course, the water supply for the Cochran house and the other houses as well was cut off. In this emergency a well was drilled for the Cochran house and an electric pump installed, at a cost of about $300, but the water from this source was so impregnated with minerals that it was unfit for use of any kind. It could not be drunk and it could not be utilized for domestic purposes.

The plaintiff had another well drilled on her portion of the land but the water that was obtained was described as the "worst" that had been seen in the neighborhood and the occupants of one of the houses said that they could hardly remain in the house after rinsing the floors with it.

These facts gleaned from the evidence emphasizes the changed water conditions which were present after the subsidence of the water which flowed from the spring.

The plaintiff estimated the damages sustained by her, by items, at $5,000. The preponderant weight of the other testimony on this subject was that the plaintiff's property was materially damaged. They did not, however, furnish figures measuring the damage.

It is a matter of common knowledge that no injury can be inflicted that would be more harmful and result in more material damage to livable premises than to deprive them of the comfort of pure and wholesome water. It is necessitous. It is an essential of domestic contentment.

It was difficult for the plaintiff to elicit from her witnesses definiteness as to the amount of damages suffered by her. She offered as a witness on this point a man named Adam Ramey, who lived about six miles from the property but who was familiar with its location and with the conditions which existed before and after the events here complained of. He was a plumber and steam-fitter by trade. He put in the water system for the Cochran house and reinstalled the heating plant. He supervised the construction of the concrete reservoir at the spring and fitted the outlet and overflow pipes which were incident to it. He made the estimate for the materials which were necessary to place the water in the other houses. He testified that a reservoir built large enough to conserve the water of the two springs, which were close together, would have afforded a volume of water sufficient to take care of the needs of eighteen or twenty families. The witness, who originally resided in the State of Kentucky, had lived at Clintwood for about seven years and conducted his plumbing operations in the counties contiguous to Dickenson county. His testimony was clear and positive and it seemed to reveal a man of general intelligence and acumen.

This witness testified that the damage to the Cochran property was from $1,500 to $2,000, that to each of the other three houses it was $800 and as to the subdivision lots the difference between their value with water and without water was about $100 per lot. His estimate exceeded that of the plaintiff by the sum of $1,700, not includ-

ing the injury to the four or five acres which were damaged by the cracks and fissures.

At the time his testimony was received in the trial no objections of any character were made to the questions and answers. His testimony was taken in the presence of the jury. After taking the testimony, and the trial, to that point, was ended, counsel for the defendant made this motion:

"Your Honor, upon reflection we have decided to move to strike out the testimony of this plumber that was on the witness stand with reference to values. Ramey is a plumber, he never owned any real estate in Dickenson county; never bought any or sold any and his testimony was not as to the difference in market value before and market value after, and he did not qualify to speak on that subject. We, therefore, move to strike that out because incompetent."

The court sustained this motion and, we think, in so doing it committed prejudicial error. The testimony of the witness should have gone to the jury for what it was worth. Its effect and weight were for the jury to assess and value.

In 1 Greenleaf on Evidence (16th Ed.) page 532, section 430, we find the following:

"It is almost universally laid down that no special training or experience is necessary for a witness to value, and that an actual acquaintance with the class of value in question is alone necessary. In particular, a witness to land-value need not be by occupation a dealer in land; nor need he himself have made purchases or sales of land; nor need he have had personal knowledge of specific sales; it is generally said that any person acquainted with such values may testify, or any person residing in or owning land in the neighborhood."

In 11 R. C. L., page 638, section 56, this is said: "In regard to property value, the standard of qualification of the witness cannot usually be fixed very high * * * . Such witnesses are not, like experts, supposed to have science and skill superior to that of the jurors, but have a knowledge

of the particular facts which the jurors have not * * *. In some cases even a general familiarity with the property without specific knowledge of sales or prices has been held sufficient to qualify a witness."

In 12 Am. & Eng. Ency. of Law (2d Ed.) page 482, we find the following:

"As a rule a witness may give in evidence an opinion as to the value of real estate based upon an acquaintance either with the property in question or with other property of like general character and location. Such opinion need not be fortified by knowledge of actual sales in the vicinity, nor, of course, by actual purchases thereof on the part of the witness, nor be knowledge of sales anywhere of precisely such tracts. Moreover, the opinion may be based upon the value of the property at a previous, if not too remote, period. And witnesses have even been permitted to testify regarding land values when their knowledge related to lands not in the immediate vicinity."

It will be noted that while the witness did not own any land in Virginia, he had owned real estate in Pike county, Kentucky, which is contiguous to Dickenson county, Virginia.

In 12 Am. & Eng. Ency. of Law (2d Ed.) page 460, it is said: "Witnesses offering their opinions of the amount of damages in a given case must usually possess the same qualifications as those testifying to value."

Counsel for the defendant urge that there is grave doubt as to whether the plaintiff is entitled to recover anything for the spring of water destroyed by defendant's mining operation.

If this doubt exists, it must be allayed by the holding of this court in the two cases of *Stonegap Colliery Co.* v. *Hamilton*, 119 Va. 271, 89 S. E. 305, 312, Ann. Cas. 1917E, 60, and *Clinchfield Coal Corp.* v. *Compton*, 148 Va. 437, 139 S. E. 308, 55 A. L. R. 1376.

In the former case, the case of *Horner* v. *Watson*, 79 Pa. 242, 21 Am. Rep. 55, was cited with approval, holding that, as to the surface owner having the right to subjacent sup-

port, the defendant would be liable for its wrongful act in withdrawing the pillars in its mine and draining the waters above.

It also quotes from the case of *Gumbert* v. *Kilgore,* 6 Cent. Rep. 406, in which it was said: "The owner of the coal is liable to the surface owner if a spring is ruined through failure to support the surface properly, but not where the injury to the spring is caused by the mining operations when the support of the surface is sufficient."

It was also said in *Stonegap Colliery Co.* v. *Hamilton, supra,* "To the same effect is section 939, 3 Farnham on Waters, where, after stating that 'the owner of the minerals has the right to use all waters found percolating therein, although the effect is to cut off the supply of water to the surface springs,' it is said: 'But where the surface and the mine belong to different owners, the owner of the mine has no right to carry on his operations in such a way as to remove the surface support, so that, if he does so, and a spring is destroyed as a result of his wrongful act, he is liable.' See also, 1 Barringer & Adams on L. of Mines, *supra,* p. 687; *Hart* v. *Jamaica, etc., Corp.,* 133 Mass. (488) 489."

In the same case it is further said: "But the plaintiff having become the owner of the surface of a contiguous boundary embracing both the Dotson and Gilliam tracts, and before the diversion of the spring on the Dotson tract, he undoubtedly had the right to the use of the water from that spring on any part of his land, and if the defendant unlawfully and wrongfully destroyed the said spring, evidence of resulting damages, if any, to the Gilliam land was competent and relevant evidence for the consideration of the jury in ascertaining the damages, if any, that plaintiff should recover."

In the second case, *Clinchfield Coal Corp.* v. *Compton, supra,* 148 Va. 437, at page 450, 139 S. E. 308, 312, 55 A. L. R. 1376, it is said:

"But it does not follow that because the water was percolating, there could be no liability on the coal company.

Liability is dependent upon the location of the point of interception of the supply. If the percolating water was on the land of the plaintiff and was there cut off by the removal of the subjacent support, to which the plaintiff was entitled, then the coal company is liable. Whether the surface is reserved by the grantor of the underlying coal, or is granted to one and the underlying coal to another, in either event the owner of the surface is entitled to subjacent support from the owner of the coal."

"Where the injuries are of a permanent nature there may be a recovery for consequences which have not yet actually ensued, if reasonably certain to follow." 8 Am. & Eng. Ency. of Law (2d Ed.) page 643.

The following case is cited in a note to the above text: "In the case of *Kansas City, etc., R. Co.* v. *Stoner* (C. C. A.) 49 F. 209, where the rule as stated was that there might be recovery for such future consequences as were reasonably certain to happen, but not for 'merely possible or even probable future effects not now apparent,' the qualifying phrase was held to constitute error on the part of the trial court, as tending to mislead and confuse the jury."

The citation of the above authorities may be subject to the criticism of an apparent digression but they show the extent to which the law goes in the matter of fully requiting the injured one.

The trial court granted two instructions which, we think, present some conflict of law as to the measure of damages.

Instruction No. 2 tells the jury that the measure of damages is the difference between the value of the land before and after the events in controversy.

Instruction No. 6 tells the jury that the measure of damages is the difference between the market value of the lands before and after the injuries complained of.

We are quite aware that sometimes the terms, *actual value, market value, fair value,* and the like, are convertible and may mean practically the same thing. Here, we think, the two measures of value are not just the same and the two instructions, differing, may have had a tendency

to confuse or mislead the jury. Instruction No. 2 is preferable.

For this reason, alone, we would be averse to reversing the case, but inasmuch as we feel impelled to do so because of the perceived error of the court in striking out the evidence of the witness, Ramey, and our very decided opinion that the verdict is an arbitrary one, in that there is no evidence as a basis for it, and that there is competent evidence that the damages awarded by the jury are inadequate, we reverse the judgment of the trial court and remand the case for a new trial on the question of the *quantum* of damages alone.

> *Reversed and remanded as to the question of damages.*