## Richmond

NORFOLK SOUTHERN RAILWAY COMPANY v. AMERICAN OIL
COMPANY.

August 30, 1973.

Record No. 8166.

Present, All the Justices.

*Richard M. Swope (Lawson Worrell, Jr.; William C. Worthington; Williams, Worrell, Kelly & Worthington,* on brief), for plaintiff in error.

*Reid M. Spencer (Gaynor V. McNeal; Wolcott, Spencer, Rivers & McNeal,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

The City of Virginia Beach (City) filed condemnation proceedings in the court below to acquire for highway purposes a parcel of land containing 9,566 square feet owned by Norfolk Southern Railway Company (Railway) and leased to American Oil Company (Amoco). Thereafter the City and Railway, with the acquiescence

of Amoco, agreed upon $73,085 as the value of the property taken, including improvements and damages. Proceedings were then had under Code § 25-46.28 for a determination of the respective portions of the deposit that should be allocated to the owner and to the tenant. The court divided the sum, $40,000 to Amoco and $33,085 to Railway. Railway appeals, contending that Amoco is entitled to no part of the deposit under the terms of its lease with Railway.

The land involved is part of a 7.4 mile strip formerly used by Railway for railroad tracks of a branch line running from Providence Junction in Chesapeake to Virginia Beach. It is commonly known as the "Kempsville Connector", and the lot in question was once known as "Kempsville Station". Several years ago Railway discontinued the use of the "Kempsville Connector" and the property along the line was reclassified by the State Corporation Commission, making it available to Railway for uses other than trackage.

On February 1, 1965 Amoco leased from Railway the 9,566 square-foot parcel, a part of the Kempsville Station property. At the same time it leased from one A. L. Bonney an adjoining triangular-shaped lot and on the combined properties constructed and operated a service station. The station building was located on the parcel leased from Railway, and we are concerned here only with this parcel. It must stand in isolation from either Bonney's parcel or another adjoining parcel owned by Railway.

The lease was for five years, with the privilege of three additional five-year terms, yielding $500 annually for the first five-year term and escalating to $600, $700 and $800 per year in respective succeeding terms.

Article One (a) of the lease reserved to Railway the right to terminate the lease at any time without liability to Amoco for any damages by giving 90 days written notice of its intention to do so, if it be determined by Railway's chief engineer that the portion of the property leased Amoco was needed by Railway for its tracks.

Article One (b) of the lease, the clause in dispute here, provides as follows:

"If at any time it shall be held that Railway cannot lawfully permit [Amoco] to use or continue to use the property hereby demised, as herein provided, Railway shall have the right to terminate this lease forthwith and shall not be liable to [Amoco] for any damages whatsoever which may result therefrom."

Article Two of the lease deals with improvements on the property and provides, in part, as follows:

> "[Amoco], at its own cost and expense, shall remove all buildings, structures, machinery and fixtures which it may have placed or erected on the premises within thirty (30) days after termination of this lease . . ."

Railway and Amoco, in providing for cancellation of the lease under the provisions of Article One (a), contemplated that Amoco would have 90 days advance notice of Railway's intention to cancel. Cancellation under Article One (a) or (b) allowed Amoco 30 days in which to remove any structures, machinery and fixtures that it had placed on the property.

The City's condemnation proceedings were initiated on March 17, 1969 at which time, pursuant to § 2.02, Charter of the City of Virginia Beach, Title 15.1, Chapter 7, Article 1 and Title 33, Chapter 1, Article 5, Code of Virginia (1950), as amended, the City filed its certificate in the clerk's office of the court below and caused the same to be recorded. The certificate, in the amount of $40,300, relates to the acquisition for street and highway purposes by the City of the real property involved here.

On March 25, 1969 Railway notified Amoco of the recordation of the certificate of deposit by the City and that Railway had been given notice to quit and vacate the premises prior to April 1, 1969. By this notice Railway cancelled and terminated its lease with Amoco, effective midnight March 31, 1969, pursuant to the provisions of paragraph (b) of Article One of the lease.

On December 18, 1969 agreement was reached as to value and the City moved for the entry of an order confirming title in the City to the property involved. Its motion was granted with a reservation that the validity of Amoco's lease was to be determined in a collateral proceeding by the court. Railway moved for a hearing to determine the respective rights and claims of Railway and Amoco to the sum deposited. The evidentiary hearing resulted in the order of the lower court now under review.

It is unnecessary that we review extensively the testimony taken or the exhibits filed. It suffices to note that at the time of the "quick taking" by the City on March 17, 1969 notice thereof was given Amoco as well as Railway. Thereafter Amoco was kept advised of all negotiations looking to a determination of the value of

the property taken by the City. It is not questioned that the agreed amount of $73,085 covered the value of the land owned by Railway, the buildings erected and improvements installed by Amoco, and any and all damages by reason of the taking. Unless Amoco is precluded from sharing in the deposit by the terms of the lease the question is whether or not the division made by the trial court was fair and equitable.

Railway argues "the proper interpretation of the lease is the crux of the case". It claims its contract with Amoco is in unambiguous terms and the rights of the parties should be determined solely from the terms of the lease, citing *Coal Riv. Coll.* v. *Eureka Coal Co.*, 144 Va. 263, 132 S. E. 337 (1926). Railway's position is that Amoco's right to continued use of the property under lease was subject to Railway's right of immediate termination under Article One (b) whenever there was a determination by competent authority that Railway could not "lawfully permit [Amoco] to use or continue to use the property"; that the City's valid exercise of its paramount power of eminent domain constituted a "holding" that there could be no longer any lawful use of the property by Railway or Amoco. It reasons that when the City filed its certificate of taking this was tantamount to a holding by the City that Railway could not thereafter permit Amoco to use or continue to use the property demised by the lease, and that such action gave Railway the right to terminate the lease.

Railway cites *Carroll Weir Funeral Home* v. *Miller*, 2 Ohio St. 2d 189, 207 N. E. 2d 747 (1965), *State* v. *Sheets*, 48 Wash. 2d 65, 290 P. 2d 974 (1955), *Newman* v. *Comm.*, 336 Mass. 444, 146 N. E. 2d 485 (1957) and *State* v. *Starzinger*, 179 N. W. 2d 761 (Iowa 1970), and quotes from 27 Am. Jur. 2d, *Eminent Domain*, § 250, pp. 22-23 as follows:

> "Of course, if the lease itself includes a provision in respect of the rights of the parties in the event of the condemnation of the leased premises, such provision is valid and controlling, if applicable to the particular case. Thus, where by its terms an appropriation for a public purpose terminates the lease, the lessee is generally entitled to no compensation for the taking, although there is some contrary authority under particular circumstances. A lease *may provide* that the lessor has the option to cancel the lease in the event of condemnation, and the issue of notice to the tenant be-

comes of importance. Where it appears that the lessor has given the tenant adequate notice of its intention to cancel, the lease is deemed terminated and the tenant is precluded from sharing in the lessor's condemnation award." (Italics supplied, footnotes omitted.)

The facts in the cited cases are dissimilar from those in the case under review.

In *Carroll Weir Funeral Home, supra,* the lease involved expressly provided for termination at the option of the lessors should the property "be condemned by public authority". The lease in *State v. Sheets, supra,* stipulated that "in the event that said premises or any portion thereof be hereafter taken over by the State of Washington or by the County of Spokane or by any other governmental body by condemnation thereof . . .", either party was entitled to cancel and without liability on the lessor to the lessee for lessee's improvements. *Newman, supra,* involved a lease to Shell Oil Company which gave the lessee the right to terminate "if all or any part of the premises is condemned for public or quasi-public use. . . ." It exercised this right when condemnation occurred, but the court denied its claim for damage to its leasehold and compensation for improvements it made on the premises. In *Starzinger, supra,* the lease provided " '[i]n case the estate hereby created shall be taken from the Lessee by process of law . . . the Lessors shall have the right at any time thereafter . . . [to] . . . terminate the lease . . . .' " There the court held that "[c]learly, as used in lease Provision (12), the intent of the parties was to include every taking involving the use or potential use of the State's authority, and contemplated a taking of the whole estate created by the lease by eminent domain or condemnation proceedings although not specifically named in this provision. Any indication that this failure disclosed an intent not to include such taking, it seems, is nullified by the use of the words 'condemned for any public purpose' in the next provision, No. (13), of this lease". 179 N. W. 2d at 764.

The lease between Railway and Amoco, prepared by the former, reserved the right to cancel only in event Railway desired to resume the use of the property as a railway, or in event Railway could not "lawfully permit [Amoco] to use or continue to use the property. . .". It omitted from the lease any reference to "condemnation proceedings", "exercise of eminent domain", "condemned taking for

a public purpose" or "taken from lessee by process of law". The lease could have provided for cancellation by Railway without liability to Amoco in event the property leased was taken in a condemnation or similar proceeding. It did not so provide. We do not construe the taking of the property by the City as a holding that Railway could not "lawfully permit [Amoco] to use or continue to use the property".

Recordation of the certificate of taking operated under Code § 33.1-122 (then Code § 33-70.4) to vest in the City all right, title and interest of both Railway and Amoco in the 9,566 square-foot lot, and the buildings and improvements thereon. The rights and interests of the owner and lessee were thereupon transferred to the fund represented by the certificate. Railway was divested of title to its property, and Amoco was divested of all interest in the improvements thereon, its leasehold interest, and its reserved right to remove buildings and improvements. Or, stated differently, the taking itself terminated the lease by removing its subject matter. Railway no longer had the demised property over which it could exercise any control or domain. It no longer owned the demised property which could be the subject of a "holding" restricting its lawful use by Amoco. Railway's notice terminating Amoco's lease was therefore an abortive act.

*Foodtown, Inc.* v. *Highway Commissioner*, 213 Va. 760, 195 S. E. 2d 883 (1973), involved a controversy between landowners and tenants over an amount deposited in a condemnation proceeding. The lease gave to the lessees the right to remove any fixtures and equipment installed on the premises. It contained a paragraph to the effect that "nothing contained herein shall prevent lessor and lessee from prosecuting claims in any condemnation proceedings for the value of their respective interests". The taking there was of the owner's land and building and certain property of the tenant. In the course of our opinion we said:

> "As a general rule a lessee is entitled to compensation for fixtures installed or erected by him which are included in property taken under eminent domain, if, as against the lessor, he has the right to remove such improvements prior to or upon the expiration of his term. *Matter of City of New York (Allen Street)*, 256 N. Y. 236, 241-247, 176 N. E. 377, 378-381 (1931); Annot., 3 A. L. R. 2d 286, 302-304 (1949), and the cases there collected. See also *Gilbert v.*

*State,* 85 Ariz. 321, 325-26, 338 P. 2d 787, 789-90 (1959)." 213 Va. at 763, 195 S. E. 2d at 886.

Since the lease between Railway and Amoco did not contain a condemnation clause, Amoco was entitled to share in the award.

The parties called numerous expert witnesses to testify as to the value of the land, the buildings and improvements placed thereon and the discounted value of Amoco's leasehold interest. Railway's witness W. E. Tolson valued the buildings and improvements at $26,700 and the lease at $9,000. Its witness Richard Bragg valued the buildings and improvements at $28,646. Its witness Aubrey Graham valued Amoco's lease at $6,650. Amoco's witness B. A. Pollok valued the buildings and improvements at $33,161 and its lease at $22,048. Its witness T. J. Economidis agreed with Pollok's appraisal of $33,161 for buildings and improvements and valued the lease at $20,164.

The record discloses that in his argument to the trial court counsel for Railway said: "[I]f you take our minimum figures you should give the oil company $33,350.00. If you take our maximum figures you should give them $37,646.00." The trial judge concluded that $33,085 represented the value of Railway's land and $40,000 represented the value of the buildings, improvements and leasehold interest of Amoco. The determination of values and equitable apportionment of the award involved questions of fact which have been resolved by the trial judge. The apportionment made finds support in the evidence.

The judgment of the lower court is

*Affirmed.*