## Richmond

### EXXON CORPORATION

### V.

### M & Q HOLDING CORPORATION

August 28, 1980.

Record No. 781589.

Present: All the Justices.

*Walkley E. Johnson, Jr. (Crenshaw, Ware & Johnson,* on briefs), for appellant.

*Richard G. Brydges* for appellee.

COCHRAN, J., delivered the opinion of the Court.

For street-widening purposes, the City of Virginia Beach on November 13, 1975[1] acquired fee simple title to a parcel of land owned by M & Q Holding Corporation and leased to Exxon Corporation.

---

[1] The record is not clear as to the date of acquisition under the "quick taking" procedure followed by the City. One order refers to the date of filing the required certificate as November 12, 1975. At the evidentiary hearing, however, and thereafter the date of November 13, 1975 was consistently used, and we will accept that as the correct date of acquisition.

Subsequently, an agreement was reached whereby the total value of the property taken and damage to the residue of the owners' land was fixed at $122,425, of which the sum of $3,925 was allocated to Exxon for the expense of removing personal property, leaving the balance of $118,500 as the amount in controversy between M & Q, the lessor, and Exxon, the lessee. After conducting a hearing, the trial court ruled that M & Q was entitled to $59,389, the value of the land taken, plus $7,000 for the cost of removing Exxon's improvements left upon the residue of the leased premises, and that Exxon was entitled to $59,111 for its improvements, less $7,000 for the removal expense. In its final order, the court expressly held that Exxon was entitled to nothing for its leasehold interest.

Exxon and M & Q filed separate petitions for appeal. We granted Exxon an appeal limited to the question whether the trial court erred in disallowing any sum for the value of the leasehold. As granted, the appeal also brought before us the question raised by the cross-error assigned by M & Q, identical to the question presented in its petition for appeal, whether Exxon was entitled to compensation for the value of its improvements left upon the residue of the leased premises upon termination of the lease by Exxon because of condemnation of a portion of the premises.

Exxon was successor in interest to Humble Oil & Refining Company, which entered into a lease agreement, effective January 1, 1968, with M & Q's predecessors in title for a parcel of land at the corner of Great Neck Road and First Colonial Road. The initial term of the lease was twenty years at an annual rental of $5,400, payable in monthly installments of $450, with options to the lessee to renew the lease for twenty additional one-year terms at an annual rental of $6,600, payable in monthly installments of $550. At its expense, the lessee demolished frame buildings upon the property, constructed thereon a brick ranch-style gasoline service station, laid paving and curbs, planted shrubbery, and installed pumps, tanks, and signs.

In its condemnation proceeding initiated in November, 1975, the City of Virginia Beach acquired title to 10,354.5 square feet of the leased parcel that had comprised 22,805 square feet, but possession was not required until the summer of 1976. During the intervening months, Exxon continued to operate its business upon the leased premises and to pay its rental to M & Q.

When effectuated, the acquisition by the City necessitated the removal of the pump islands and underground tanks installed by

Exxon.[2] The land taken did not include the service station building. However, because of zoning and space requirements, the building could no longer be used for its intended purpose. Accordingly, Exxon terminated its lease and vacated the premises in the summer of 1976 pursuant to the provisions of Clause (11)[3] of the lease agreement.

Howard D. Sipler, Exxon's real estate representative, testified to the nature and cost of improvements placed upon the leased premises by the lessee. According to his records, there was a seven percent average increase in gallonage sold at the station each year during its operation. In his opinion, Exxon would have continued to use the property until the end of the last option period under the lease. Sipler further testified that after the station was closed the operator relocated on the opposite corner of Great Neck Road. He estimated the cost of removing worthless improvements from the leased premises at approximately $3,000.

Two expert witnesses, Cecil E. Sears and Theodore J. Economidis, testified for Exxon, and one expert, Robert F. Ripley, testified for M & Q. Sears estimated the depreciated value of Exxon's improvements as of the date of the taking to be $77,278. In his opinion, the normal market rental, or economic rental, of the leased premises on that date was $775 per month. He subtracted from this the contract rental of $450 per month, multiplied the difference by the

---

[2] Clause (5) of the lease provided in pertinent part:

"Lessor agrees that all buildings, structures, tanks, machinery, equipment and all other property owned by Lessee heretofore or hereafter placed upon the premises, whether annexed to the freehold or not, shall remain the personal property of Lessee, and Lessee shall have the right and privilege (but shall be under no obligation) to remove such property at any time during the period of this lease or any renewal thereof.

"Upon the expiration or termination of this lease or any renewal thereof, Lessee shall have a period of sixty (60) days within which to remove its property or negotiate its sale to an incoming tenant or supplier. The leaving of such property on the premises during said period, shall not make Lessee liable for storage charges or rent, and shall not constitute a hold-over tenancy."

[3] "(11) If the demised premises or any part thereof shall be taken by or pursuant to governmental authority or through exercise of the right of eminent domain, or if a part only of said premises is taken and the balance of said premises in the opinion of Lessee is not suitable for the operation of a drive-in gasoline service station, this lease, at the option of Lessee, shall terminate without further liability on the part of Lessee, or the rent hereunder shall be reduced in proportion to the reduction in the area of the premises, but nothing herein shall be deemed a waiver of the sole right of Lessee to any award for damages to it or to its leasehold interest caused by such taking, whether made separately or as part of a general award."

remaining number of months in the initial term, discounted the figure to present value, and capitalized it at ten percent. The resulting figure, $29,407, represented the value of the leasehold interest for the initial term of the lease. He used the same procedure for the option periods and arrived at the sum of $5,735. The combined totals, $35,142, constituted the total value of the leasehold interest. Adding this sum to the depreciated value of improvements, $77,278, Sears estimated that Exxon was entitled to $112,420, less $2,490 for compensation already received by Exxon for removal of tanks, and $11,750, the amount of a bid obtained by Sears for removing the improvements and grading the residue of the lands, or the sum of $98,180. He valued the land taken in the condemnation at $27,126.

Economidis estimated the depreciated value of Exxon's improvements at $53,726 on the date of the taking, and the value of the leasehold interest at $37,708 ($29,299 for the original term and $8,409 for the option periods), making a total of $91,434 to which, in his opinion, Exxon was entitled. He valued the leasehold by following the same procedure outlined by Sears, but he estimated that the economic rental for the leased premises was $808.33 per month.

Ripley based his appraisal upon the assumption that Exxon had elected to terminate its lease and therefore was not entitled to receive any money representing the value of the leasehold. He testified that the service station building was valueless after the condemnation, and that the depreciated value of Exxon's improvements prior to the taking was $50,000, less thirty percent deducted for obsolescence because the station provided full service rather than self-service, leaving a total of $35,000. He appraised the value of the land taken at $41,418, based upon $4 per square foot. Ripley concluded that Exxon was entitled to $3,023 of the $118,500 in dispute, but his rationale and his methodology in arriving at this result are unclear. He considered only the original term of the lease and disregarded the options. It appears that he computed the "reversionary value" of the leased premises, reduced to present value, at $34,101.36, to which he added the amount of income that would have been paid under the lease during the eleven years remaining on the original term, reduced to present value, which he estimated at $61,090.13, making a total value of the lease to the lessor of $95,191.49. From this he subtracted $92,168, the value of the leased premises at $4 per square foot, and obtained the sum of $3,023.49, but he did not explain what this figure represented or why Exxon was entitled to it.

Ripley summarized his appraisal in an effort to clarify his testi-

mony. He valued the land taken at $41,418, the temporary construction easement at $1,254, the utility easement at $11,820, damage to the leased premises at $40,699.49, and damage to the remainder of the lessor's property at $36,090, making a total of $131,281, less the sum of $3,023 payable to Exxon, leaving the net amount of $128,258 payable to M & Q.

Having valued the leased premises at $92,168, Ripley conceded that $9,200, a return of ten percent, would be a reasonable annual rental for the property. He asserted, however, that he did not consider economic rental in making his appraisal because Exxon had cancelled the lease and abandoned the site.

The trial court in its letter opinion dated August 7, 1978, rejected the lessor's contention that by abandoning the property Exxon forfeited its right to any of the condemnation proceeds, and stated that the building had value to which Exxon was entitled, less the lessor's cost of removal. The court further concluded that Exxon's position that it was entitled to "the benefit of the leasehold" but was "freed of any adverse clause of the lease, such as the requirement to pay rent" was "totally unfair and wrong". There was no explanation as to how the trial court arrived at the valuation of $59,389 for the land, $7,000 for removal costs, and $59,111 for the building.

■ In this case, the condemnation award paid into court was for the property acquired by the City and damages, over and above any enhancement in value, to the residue of the landowner's property. Under Code § 25-46.28 the court was then required to determine how the award should be distributed among those claiming interests therein. As the property acquired was subject to a lease, the value of the lessee's interest first should be determined and deducted from the award, and the balance then allocated to the landowner. *Realty Corporation* v. *City of Norfolk,* 199 Va. 716, 725, 101 S.E.2d 527, 534 (1958), quoting with approval *Fonticello Co.* v. *Richmond,* 147 Va. 355, 370, 137 S.E. 458, 463 (1927).

■ The interests in the property are determined as of the date of the taking, which is the date at which the value of the land taken and the damages are established. The outstanding lease on that date had a significant bearing upon the determination of the fair market value of the parcel acquired by the City and the damages to the residue. The lease controlled the return to which the lessor was entitled, and the annual rental, if capitalized, could be used in determining the value of the parcel taken in condemnation. Thus, the lease was a major factor in establishing the amount of the award,

and the lessee is entitled to have its interest ascertained as of the date of the taking.

In *Norfolk Southern Ry.* v. *American Oil*, 214 Va. 194, 198 S.E.2d 607 (1973), the lessor and the lessee also agreed upon the amount of the condemnation award and disagreed as to its proper distribution among the claimants. The trial court, after considering evidence as to the value of the land, the value of the buildings and improvements placed thereon by the tenant and the discounted value of the tenant's leasehold interest, made findings of fact as to values and apportioned the award accordingly. We affirmed the judgment of the trial court and held that the condemnation terminated the lease, that both the lessor and the lessee had interests in the award, and that the apportionment made by the trial court was supported by the evidence. Thus, we recognized the validity of a tenant's claim to the discounted value of its leasehold interest.

M & Q argues, however, that *Norfolk Southern* is distinguishable from the present case because the lease was terminated by the condemnation of the entire leased parcel, whereas here, the taking was not of the entire parcel and the lease was not terminated until many months later when Exxon voluntarily cancelled it. M & Q relies upon *Newman* v. *Commonwealth*, 336 Mass. 444, 146 N.E.2d 485 (1957).

In *Newman*, there was a condemnation of 3,512 square feet of a parcel containing 14,613 square feet leased to Shell Oil Company which had placed thereon improvements removable at the end of the term. Some months after the taking by condemnation, Shell terminated the tenancy pursuant to a provision in the lease. The Massachusetts Supreme Court held that the lessee, having voluntarily terminated the lease, was not entitled to recover for damage to the leasehold. The court further held that Shell could not recover compensation for the improvements which it had made and which it had the right to remove, because under Massachusetts law improvements subject to removal by the lessee were not in themselves an interest in real estate, but were compensable only to the extent they enhanced the value of the estate.

To the same effect is *City of Lake Forest* v. *First Nat'l Bank*, 52 Ill. App. 3d 893, 368 N.E.2d 156 (1977), where the lessee, Union Oil Company, under a lease permitting it to cancel in the event of a condemnation, voluntarily cancelled its lease between the date the condemnation petition was filed (the date of valuation) and the date the compensation award was paid (the date the condemnor was au-

thorized to enter the property). Relying upon *Newman,* the court denied the lessee any portion of the award.

In neither *Newman* nor *Lake Forest* was there any lease provision similar to Clause 11 of the Exxon lease permitting the lessee to terminate upon a partial condemnation but reserving to the lessee its right to receive from the award damages to it or to its leasehold interest caused by the taking. The inclusion of this provision makes the Exxon lease entirely different from the leases under consideration in *Newman* and *Lake Forest.* We hold, therefore, that Exxon was entitled to compensation for the value of its leasehold interest.

■ Moreover, we have approved a different rule from that set forth in *Newman* in respect to improvements installed by a tenant and removable by him. We have said that, as a general rule, a tenant is entitled to compensation for such improvements included in property taken in condemnation if, as against the lessor, he has the right to remove the improvements prior to or upon termination of his lease. *Foodtown, Inc.* v. *Highway Commissioner,* 213 Va. 760, 763, 195 S.E.2d 883, 886 (1973). Exxon's building was not included in the property taken by the City. However, it is uncontroverted that the building was removable by Exxon at or prior to the end of the term under Clause (5) of the lease, and that it was rendered worthless by the condemnation. Therefore, the residue of the leased premises was damaged to the extent of the entire value of the building and other worthless improvements, such as paving and planting. We conclude, as a corollary to the general rule approved in *Foodtown,* that the lessee is entitled to compensation for its removable improvements damaged by the condemnation.

■ Having decided that Exxon was entitled to compensation for the value of its leasehold interest and the damages to its improvements, we turn to the evidence pertaining to these interests. Sears and Economidis followed the same procedure in evaluating the leasehold interest. They testified, and Ripley conceded, that the market rental of the leased parcel exceeded the contract rental. They discounted the differential over the initial term and option periods to obtain present value. This method has been recognized by us in *Norfolk Southern,* and it has been approved in other jurisdictions. *See Land Clearance for Redevelop. Corp.* v. *Doernhofer,* 389 S.W.2d 780 (Mo. 1965); *Frownfelter* v. *Graham,* 169 Ohio St. 309, 159 N.E.2d 456 (1959); *In Re Appropriation for Highway Purposes,* 166 Ohio St. 249, 142 N.E.2d 219 (1957). When the leasehold interest is appraised in this manner, the lessee is not, as the trial

court erroneously concluded, freed from the burden of paying rental. The computation charges the lessee with the entire rental required under the lease, but gives him the benefit of enhanced market value that makes the lease an advantageous one for him. Where the lessee has options to extend a favorable lease, it is appropriate to assume that the options will be exercised. *See United States* v. *Petty Motor Co.,* 327 U.S. 372, 375 (1946).

If market values have declined, so that the contract rental equals or exceeds the economic rental, the lessee is entitled to nothing for the leasehold. Indeed, the leasehold may have a negative value. Where, as in this case, the evidence shows that the lessee has an advantageous lease, it is the duty of the trial court to determine the value of the leasehold. The error of the trial court in denying Exxon any compensation for its leasehold interest requires reversal of the final judgment.

We will not disturb the trial court's findings of fact that Exxon was entitled to the sum of $52,111 for damage to its improvements, after deducting $7,000 for the cost of removal. The evidence of the depreciated value of the improvements at the time of the taking varied from $35,000 (Ripley) to $77,278 (Sears). The evidence as to cost of removal and grading varied from $3,000 (Sipler) to $11,750 (Sears). The trial court's findings of fact, falling approximately midway between the extremes, are reasonably supported by the evidence.

For the reasons assigned, we will reverse the judgment of the trial court and remand the case for further proceedings to determine the value of Exxon's leasehold interest not inconsistent with the views herein expressed.

*Reversed and remanded.*