Present: Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and
Kinser, JJ., and Whiting, Senior Justice

SNYDER PLAZA PROPERTIES, INC.

v.  Record No. 991306   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                          April 21, 2000
ADAMS OUTDOOR ADVERTISING, INC.


            FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                     Everett A. Martin, Jr., Judge


     In this appeal of a declaratory judgment, we consider

whether the chancellor properly approved a report of a

commissioner in chancery that fixed the value of a leasehold

interest in a portion of a parcel of condemned property.

     Snyder Plaza Properties, Inc. (Snyder) owned a parcel of

land, which was used as a parking lot and was bounded by St.

Paul's Boulevard, City Hall Avenue, and Plume Street in the

"downtown financial district" of Norfolk.  Since 1953, Snyder

had leased a portion of the land to Adams Outdoor Advertising,

Inc. (Adams), or its predecessor, to permit the installation and

maintenance of four 12' X 25' billboard signs.  Adams, in turn,

engaged in the business of renting space and installing

advertising on the billboard signs.

     In July 1995, the City of Norfolk (the City) exercised its

power of eminent domain and condemned Snyder's property.  Snyder

and the City reached a settlement agreement concerning the value

of the property taken.  The City agreed to pay Snyder $2.4

million "plus up to . . . ($38,000) to pay one-half (½) of Snyder's settlement with Adams Outdoor Advertising."

At the time of the condemnation, Snyder and Adams had in effect two written leases involving the four billboard signs. The leases, dated January 3, 1990, were each for a term of three years with a provision for an automatic renewal for a term of five years (collectively, the initial terms). The leases stated that they "shall continue year-to-year thereafter unless terminated by either party," and that Snyder reserved the right to cancel the leases "if the property is sold or developed." In paragraph 9, the leases provided:

> In the event of condemnation or threat of condemnation, Lessee [Adams] shall have the right to timely participate in any condemnation award or settlement to the extent of Lessee's damage for the loss of revenue of the structure; the costs of removal from the above-described premises; replacement costs; and, the loss of its leasehold interest and other related damages.

After Snyder's condemnation settlement with the City, Adams filed this declaratory judgment suit against Snyder, seeking a determination of the amount of damages to which Adams was entitled as a result of the condemnation. The trial court referred the matter to a commissioner in chancery, who was directed to receive evidence and make a recommendation regarding the damages due to Adams.

At an evidentiary hearing, the commissioner heard testimony from three real estate appraisers concerning the value of Adams' leasehold interest.[1]  Adams' principal expert witness was Donald T. Sutte, a licensed real estate appraiser, who testified that he used two types of analyses to determine the leasehold's value, a sales comparison approach and an income approach.  Under the sales comparison approach, Sutte determined that the leasehold value was $112,300.  Under the income approach, he determined that the value of Adams' leasehold interest was $98,800.

Sutte stated that the sales comparison approach was the "most valid" method of appraising Adams' interest, and explained that this method of valuation was commonly used throughout the outdoor advertising industry.  Using that method, Sutte examined eight recent sales of similar leasehold interests involving billboard signs located in a number of other states.  He divided the leasehold sale price in each transaction by the annual gross income generated by the billboard signs involved in the sale, to arrive at a "gross income multiplier" for each transaction.

---

[1] Adams did not present evidence concerning any other element of damage.

The range of "gross income multiplier[s]" resulting from the eight comparison sales was 2.97 to 7.04. Sutte testified that a "gross income multiplier" range of 3.0 to 6.0 has remained fairly constant in the outdoor advertising industry over the past ten years. Based on the desirable location of the billboard signs at issue, their long history at that location, and the lack of any other billboard signs in the general area, Sutte used a "gross income multiplier" of 4.0 to value Adams' leasehold interest.

Sutte next determined the annual "economic rent" of the billboard signs. He explained that this term represents the annual rent that the billboard signs should command in the marketplace. He calculated this amount by including such factors as each sign's location, rental history, and daily effective circulation. Sutte concluded that the annual economic rent of the billboard signs was $31,200. From that amount, he subtracted a 10% figure for vacancy and collection losses to arrive at the effective gross annual income of the billboard signs, which he calculated at $28,080. Sutte multiplied this amount of effective gross annual income by the "gross income multiplier" of 4.0 to conclude that Adams' leasehold

4

interest in the subject billboard signs had a market value of $112,300.

Sutte testified that although only 30 months remained on the initial terms of Adams' leases with Snyder at the time of the condemnation, there was "no reason to believe" that the leases would have been terminated had the property not been condemned. He explained that all the national sales he used as comparisons involved the sale of similar leasehold interests, and that the risk of termination of the leases at issue was factored into the "gross income multiplier" he used to arrive at his valuation.

Under his alternative method, the income approach to value, Sutte subtracted sign vacancy and collection losses from the billboard signs' annual economic rent of $31,200 to reach the effective gross annual income figure of $28,080. From this annual gross income amount, he subtracted operating expenses to yield a net annual operating income of $14,321. He applied a capitalization rate of 14.5% to the "net operating income" amount to reach his leasehold valuation of $98,800.

Adams presented the testimony of another licensed real estate appraiser, Gregory A. Hanson, who used the sales comparison approach to determine the value of Adams' leasehold interest. Hanson agreed with Sutte that this

5

method of valuation was commonly used in the outdoor advertising industry. Applying a "gross income multiplier" of 3.4 to his calculation that the billboard signs had an annual gross income of $24,281, Hanson concluded that Adams' leasehold interest had a value of approximately $83,000.

Hanson explained that the billboard signs at issue are no longer a permitted use under the existing zoning classification of Snyder's property and, thus, are a non-conforming use of the property. Under the terms of the leases, Adams owned the billboard signs and retained the right to remove them. Hanson testified that if Snyder had terminated its leases with Adams, and Adams had removed the billboard signs, Snyder would have been unable to replace them. Since continuation of the leases would have been "beneficial" to both Snyder and Adams, Hanson stated that he had "no reason to assume" that the leases would have been cancelled at the end of 30 months.

Snyder presented the testimony of a licensed real estate appraiser, Bruce F. Hatfield, who stated that in his opinion, the fair market value of Adams' leasehold interest was $21,500. Hatfield arrived at this sum by multiplying the net monthly income from the billboard signs, which he calculated at $436, by the number of months remaining on

6

the leases, and then adding three years of "possible" renewal income and deducting the cost of removing the signs.

Hatfield acknowledged that he had very limited experience in appraising leasehold interests in billboard signs. He also stated that he was not aware that the billboard signs at issue had been located on the Snyder property since 1953. Hatfield testified that he considered it likely that the leases would have been renewed for as much as three years beyond the initial terms. However, he also concluded that the "demographics of downtown Norfolk, though, would dictate that sometime within a five-year period this property would fall to development or be sold."

The commissioner issued a report in which he applied a variation of the income approach to reach his conclusion that the present value of Adams' leasehold interest on the date of condemnation was $61,731.05. The commissioner arrived at this sum by incorporating Sutte's calculations of the billboard signs' annual economic rent, annual gross income, and annual net income. The commissioner divided the billboard signs' annual net income of $14,321 by 12 to determine a "Monthly Net Sign Rental" amount of $1,193. The commissioner multiplied this monthly income figure by 60 months, which represented the "Remaining Term of Lease

7

(31 months) and probable renewal (29 months)," and determined a "Total Income for Sign Rental" of $71,508. The commissioner discounted this "total income" figure to reflect the present value of Adams' leasehold interest, which he fixed at $61,731.05.

Both Snyder and Adams filed exceptions to the commissioner's report, challenging the method adopted by the commissioner in determining the value of Adams' leasehold interest. The chancellor overruled both parties' exceptions and entered judgment in favor of Adams in the amount recommended by the commissioner. Snyder appeals from the final judgment and Adams assigns cross-error.

On appeal of a chancellor's decree approving a commissioner's report, we apply an established standard of review. A decree of this nature will be affirmed unless it is plainly wrong or without evidence to support it. Lansdowne Dev. Co. v. Xerox Realty Corp., 257 Va. 392, 402 n.5, 514 S.E.2d 157, 162 n.5 (1999); Lim v. Choi, 256 Va. 167, 171, 501 S.E.2d 141, 143 (1998).

Although a commissioner's report does not carry the weight of a jury verdict, Code § 8.01-610, a chancellor should sustain the report if the evidence supports the commissioner's findings. Lim, 256 Va. at 171, 501 S.E.2d at 143; Chesapeake Builders, Inc. v. Lee, 254 Va. 294, 299, 492 S.E.2d 141, 144 (1997);

*Morris v. United Virginia Bank*, 237 Va. 331, 337-38, 377 S.E.2d 611, 614 (1989). This rule applies with particular force to the report's factual findings that are based on evidence that the commissioner heard *ore tenus*, but does not apply to pure conclusions of law contained in the report. Id. On appellate review, the commissioner's findings of fact that have been confirmed by the chancellor will be reversed only if they are plainly wrong or without evidence to support them. *Moore & Moore Gen. Contractors, Inc. v. Basepoint, Inc.*, 253 Va. 304, 306, 485 S.E.2d 131, 132 (1997); *Cooper v. Cooper*, 249 Va. 511, 518, 457 S.E.2d 88, 92 (1995).

In its first three assignments of error, Snyder essentially contends that the commissioner erred in including in his valuation calculation an amount of lost income for 29 months beyond the initial terms of the parties' leases. Snyder argues that since in a condemnation proceeding, a lessee generally is entitled to compensation only for the value of any remaining term of a lease, the commissioner was plainly wrong in considering a "mere expectation of renewal" in fixing the value of Adams' leasehold interest. We disagree with Snyder's arguments.

The commissioner's decision to calculate Adams' lost income over a period of 60 months was not plainly wrong or without evidentiary support. That decision was supported by the

language of the leases, the evidence concerning factors peculiar to the outdoor advertising industry, and the opinions of the three expert witnesses that it was unlikely that the leases would have terminated at the end of their initial terms.

The lease language provided that the leases "shall continue year-to-year [after the initial terms] unless terminated by either party." Donald Sutte explained that this type of lease, which provided an initial term of years followed by renewal options that included a termination clause in the event the land is sold or developed, is "typical" in the outdoor advertising industry, and that leases containing such provisions are bought and sold routinely on the open market.

The commissioner was entitled to consider these renewal provisions in his valuation calculation, based on his factual finding that "there is a good likelihood that the leases would [have] be[en] renewed until the site was converted to develop office buildings, multifamily high rises and the like. Mr. Hatfield saw that day to be no more than five (5) years from the date of the taking." The commissioner noted that the billboard signs had been located on Snyder's property for several decades. He also observed that Snyder's own expert had testified that it was likely that the leases would have "roll[ed] over" for another two or three years beyond the period remaining on the initial terms. We conclude that this testimony and evidence

supports the commissioner's decision to calculate Adams' lost income over a 60-month period.[2]

Snyder next asserts that the commissioner erred in admitting testimony that the annual economic, or market, rent of the billboard signs was $31,200, when the actual annual rent was $24,282. Snyder also contends that the commissioner's use of the economic rent figure was inappropriate, alleging that Sutte and Hanson calculated that amount based on "fee simple interest rather than leasehold interest." We find no merit in these arguments.

Initially, we observe that Snyder is incorrect in its assertion that Sutte and Hanson calculated annual economic rent "based on a fee simple interest." After Snyder raised this objection during Sutte's testimony at the commissioner's hearing, Sutte restated the fact that his calculations were based on his appraisal of Adams' leasehold interest. Hanson

---

[2]Snyder also alleges that the chancellor erroneously accorded credibility to testimony from Sutte and Hanson that "there was no difference between the leasehold interest and the fee simple interest of the plaintiff." In addition, Snyder asserts that the chancellor erred when he "permitted evidence of national sales of outdoor sign companies outside of Virginia as comparable[] to a leasehold interest in this particular case." These allegations inaccurately characterize the testimony of Sutte and Hanson, as well as the evidence of comparable sales presented to the commissioner. Moreover, we discern no basis for concluding that either the chancellor or the commissioner based their calculation of Adams' damages on such evidence or theories.

11

likewise testified that he appraised the value of the leasehold interest.

We also disagree with Snyder's assertion that the commissioner erred in admitting and ultimately adopting the expert testimony concerning the economic rent of the billboard signs. We previously have recognized the distinction between economic rent and actual contract rent in the valuation of a leasehold interest in condemned property. In Exxon Corp. v. M & Q Holding Corp., 221 Va. 274, 269 S.E.2d 371 (1980), we considered a trial court's ruling in a condemnation proceeding denying a lessee recovery of the value of its leasehold interest in the condemned property.

In that case, Exxon Corporation, which had operated a gasoline station on the condemned property, presented two witnesses at the condemnation proceeding who testified concerning the value of its leasehold interest. The experts applied a methodology that in part used the economic, or market, rent of the leased parcel to obtain the differential amount above Exxon's actual contract rent that Exxon lost as a result of the condemnation. 221 Va. at 281, 269 S.E.2d at 376-77. In reversing the trial court's judgment denying Exxon the value of its leasehold interest, we noted that the valuation method used by Exxon's appraisers had been applied previously in this and other jurisdictions. 221 Va. at 280-82, 269 S.E.2d at 375-77.

12

In the present case, we conclude that the commissioner did not err in accepting Adams' expert testimony concerning the economic rent of the billboard signs in valuing the leasehold interest. Sutte explained, in considerable detail that we need not repeat, the factors he considered in calculating the economic, or market, rent generated by the billboard signs. The commissioner, in his role as fact-finder, found that Sutte's economic rent figure was the most accurate reflection of the billboard signs' value to Adams, and the chancellor confirmed this finding. This conclusion is supported by the evidence and is not plainly wrong.

Snyder also argues that the commissioner erred in prohibiting Louis D. Snyder, the president and part owner of Snyder Plaza Properties, Inc., from testifying regarding his opinion of the value of Adams' leasehold interest. The commissioner based his ruling on Snyder's failure to identify Louis Snyder as an expert witness on the subject of valuation of the leasehold interest, in response to interrogatories propounded by Adams. Snyder argues that Louis Snyder, as an "owner," was qualified to express a lay opinion regarding the value of the leasehold interest, and that Snyder had no obligation to list him as an expert witness in response to Adams' interrogatories. We disagree with Snyder's argument.

We have recognized the general rule that an owner of property is competent and qualified to render a lay opinion regarding the value of that property. <u>Haynes v. Glenn</u>, 197 Va. 746, 750, 91 S.E.2d 433, 436 (1956); see <u>Parker v. Commonwealth</u>, 254 Va. 118, 121, 489 S.E.2d 482, 483 (1997); <u>Walls v. Commonwealth</u>, 248 Va. 480, 482, 450 S.E.2d 363, 364-65 (1994). This rule does not apply here, however, because Louis Snyder was not the owner of Adams' leasehold interest, which was the property about which he sought to state an opinion.

Snyder, citing <u>Kerr v. Clinchfield Coal Corporation</u>, 169 Va. 149, 192 S.E. 741 (1937), asserts, nevertheless, that he was competent to testify as a lay witness. In <u>Kerr</u>, we recited the general principle that a witness, who is not a true expert, may give evidence regarding the value of real estate based on a demonstrated acquaintance with the property at issue or with properties of like general character and location. <u>Id.</u> at 156, 192 S.E. at 743. In the present case, however, Snyder made no claim that Louis Snyder had any knowledge concerning leasehold interests in the outdoor advertising industry or the type of leasehold interest at issue. Therefore, we conclude that the commissioner did not abuse his discretion in excluding Louis Snyder's proposed valuation testimony.

Adams assigns cross-error to the chancellor's confirmation of the valuation method used by the commissioner. Adams argues

14

that the commissioner and the chancellor should have applied the sales comparison approach using "gross income multipliers," instead of using an income approach.  We disagree with Adams' argument, because Adams' own appraiser, Sutte, testified that an income approach was an acceptable method of valuing a leasehold interest, although he preferred a sales comparison approach of valuation.  The commissioner and chancellor were not obligated to accept Sutte's evaluation of the merits of the two methods.  Since the record contains evidence supporting the method used by the commissioner, we conclude that there is no error in the chancellor's decision confirming the use of that method.  Thus, we hold that the chancellor did not err in approving the commissioner's report and in entering judgment in accordance with the commissioner's recommendation.

For these reasons, we will affirm the chancellor's judgment.

Affirmed.