PRESENT:  All the Justices

GLASSER & GLASSER, PLC, TRUSTEE FOR
FIRST MORTGAGE BONDHOLDER, 2006 SERIES

v.   Record No. 120287                    OPINION BY
                                    JUSTICE DONALD W. LEMONS
                                       February 28, 2013
JACK BAYS, INC., ET AL.

CITIZENS BUSINESS BANK

v.   Record No. 120288

JACK BAYS, INC., ET AL.

CELTIC BANK

v.   Record No. 120289

JACK BAYS, INC., ET AL.

        FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                   Mary Grace O'Brien, Judge

     In this appeal, we consider the validity of various

mechanics' liens filed under Code § 43-4.

                  I.   Facts and Proceedings

        A.   New Life's Construction Project, Contractors,
                          and Financing

     Jack Bays, Inc. ("Jack Bays") is a commercial general

contracting firm with expertise in new church construction.

In 2004, the company's President, Lynn Bays Fuechsel

("Fuechsel"), met the Senior Pastor and Founder of New Life

Anointed Ministries International ("New Life"), Bishop Eugene

Reeves ("Bishop Reeves").  At the time, New Life was beginning

the process of building a church in Woodbridge, Virginia.

Jack Bays ultimately became the general contractor on the project.

On August 22, 2005, Jack Bays submitted a proposal for the site work portion of the project. Site work included excavation and grading, utility installation, concrete and asphalt paving, landscaping, and fencing. New Life accepted the proposal either contemporaneously or shortly thereafter by signing an owner/contractor agreement form ("August '05 Agreement"). The agreement form stated that New Life would pay Jack Bays a stipulated sum of $4,209,532 for initial work at the project site.

On September 29, 2005, Jack Bays began site work. On April 26, 2006, a new Agreement ("April '06 Agreement") provided that New Life would pay Jack Bays a stipulated sum of $12,016,000. The April '06 Agreement incorporated the sum and scope of work from the August '05 Agreement.

On December 5, 2006, the parties increased the value of the contract for the final time. Change Order 13 required construction on a preschool, sanctuary, lobby and corridors. The cost of this project was $5,858,732, which brought the total cost of the project to $17,874,732. The contract provided for payment of requisitions from Jack Bays based upon percentage completion of the project.

To perform work at the site, Jack Bays contracted with several subcontractors, the following eleven of which are parties to this action: Structural Steel, LLC ("Structural Steel"), United Sprinkler Company, Inc. ("United Sprinkler"), Virginia Paving Company ("Virginia Paving"), Sparkle Painting Company, Inc. ("Sparkle Painting"), Scaffold Resource, LLC ("Scaffold Resource"), Miller Construction, Inc. ("Miller Construction"), Adrian L. Merton, Inc. ("Adrian Merton"), Century Contracting Corporation ("Century Contracting"), Clover Contracting, Inc. ("Clover Contracting"), General Glass Corporation ("General Glass"), and Becker Electric Company.[*]

After briefly working with Branch Banking and Trust, New Life sought additional funds for the project. To obtain these funds, New Life worked with Strongtower, a bonding company for church financing. This collaboration led New Life to obtain additional financing, specifically in the amount of $13.6 million. San Joaquin Bank (the predecessor to and hereinafter "Citizens Business Bank"), 1st Centennial Bank (the predecessor to and hereinafter "Celtic Bank"), and Glasser & Glasser, PLC ("Glasser & Glasser") (collectively, "Lenders") were listed as "Lenders" on the Deed of Trust for the new financing, while Stewart Title Guaranty Company ("Stewart

---

[*] When referring to the general contractor and the subcontractors we will use the term "Contractors."

3

Title") was designated "Trustee." Glasser & Glasser was also designated Trustee for "First Mortgage Bondholders, 2006 Series" ("Bondholders"). Citizens Business Bank obtained a note evidencing the debt in the principal amount of $8,962,000. Celtic Bank obtained a note in the principal amount of $4,491,000. Additionally, the Deed of Trust incorporated a $13,453,000 Trust Indenture "for the benefit of certain Bondholders," with Glasser & Glasser as Trustee, and Reliance Trust Company as the trust company and disbursement agent. The Lenders recorded their Deed of Trust on June 27, 2006.

On September 29, 2005, Jack Bays issued its first requisition for payment to New Life. New Life paid in full, and continued to pay its requisitions in full each month through March 2007. New Life paid part of Jack Bays' April 2007 requisition, falling $141,498.70 short of total payment. Thereafter, New Life made no payments to Jack Bays from May through October 2007, because funding for the project was exhausted.

Throughout the May-October 2007 period, New Life attempted to obtain additional financing. Jack Bays understood from Bishop Reeves that new funding would be obtained to cover the cost of the project. On July 27, 2007, Monika Taylor, an underwriter for Quest Capital Funding, wrote

4

to Fuechsel to "inform [Fuechsel] that we are going through final approval for a $20,000,000.00 (Twenty Million Dollar) loan for New Life Anointed Church." From her conversations with Bishop Reeves, Fuechsel expected to be paid for Jack Bays' prior, ongoing, and future work on or around August 3, 2007. After the anticipated loan from Quest Capital Funding did not close, Fuechsel was told that financing would instead be in place by the end of August. However, no further financing was obtained. Jack Bays continued construction work at the site from May through September 28, 2007.

### B. Contract Work and Demobilization, Mechanics' Liens, and Termination

On September 28, 2007, Jack Bays sent a memorandum to its subcontractors. The memorandum detailed New Life's efforts to obtain financing, and informed the subcontractors that delays in the approval process caused Jack Bays to immediately "stop[] active work on the site until all payments are current." The letter asked the subcontractors to consider waiting until November 2007 to file a mechanics' lien so that title could remain clear and enable New Life to "have the best opportunity to obtain financing."

After September 28, 2007, Jack Bays began to shut down active work on the project by collecting equipment and rectifying unsafe conditions on the premises. Jack Bays

5

maintained a log of site work during this time and issued a requisition for October 2007 work it classified as "demobilization."

According to Jack Bays, subcontractors continued work at the site through October 11, 2007. However, United Sprinkler performed "normal course of business" work through at least October 18, 2007. Sparkle Painting had an employee working on site through at least October 1, 2007, and possibly through October 9, although information supporting the latter date was inconclusive. Scaffold Resource entered the premises on October 1 to remove scaffolding provided, completing this work – which was provided for in its contract with Jack Bays – on October 16. Becker Electric continued contract completion work on the project by performing wiring work related to pulls and terminations at electrical panel locations and rooftop units through October 16, although this was primarily in an effort to address safety concerns associated with exposed live electrical wires.

Jack Bays alleged that its activity at the project site between October 1 and November 16, 2007, was a necessary part of its demobilization efforts, and that any contract work performed by subcontractors during that time was at the subcontractors' own risk. However, Jack Bays increased the percentage by which it evaluated the completeness of the

6

project's work between its September and October 2007 requisitions by 2%, from 92% to 94%. Whether Jack Bays' actions and the actions of the subcontractors in October and November 2007 constitute continuing contract work or demobilization is disputed by the parties to this action.

On December 28, 2007, Jack Bays recorded its Memorandum of Mechanic[s'] Lien against New Life in the amount of $5,942,487.48 in the Circuit Court of Prince William County. The following table summarizes the dates on which subcontractors recorded their memoranda of mechanics' liens, and the value of those liens:

| Subcontractor | Date | Value |
|---|---|---|
| Clover Contracting | 12/20/07 | $60,814.37 |
| Adrian L. Merton | 12/20/07 | $323,165.20 |
| General Glass | 12/20/07 | $50,544.00 |
| Century Contracting | 12/20/07 | $134,303.00 |
| Capital Contracting | 12/21/2007 | $217,575.00 |
| Virginia Paving | 12/27/07 | $423,583.27 |
| Sparkle Painting | 12/27/07 | $13,950.00 |
| Structural Steel | 12/27/07 | $139,922.00 |
| Miller Construction | 12/28/07 | $99,654.00 |
| Scaffold Resource | 1/11/08 | $75,867.80 |
| Becker Electric | 1/22/08 | $549,545.00 |
| United Sprinkler | 1/29/08 | $97,664.40 |

On May 8, 2008, Jack Bays sent a letter to New Life terminating the April 26, 2006 construction contract. Between June 19 and July 14, 2008, all Contractors timely filed complaints in the Circuit Court of Prince William County ("circuit court") against the Lenders and Stewart Title.

C.    Proceedings before the Commissioner of Accounts and the Circuit Court

By Decree of Reference and Order of Consolidation and Reference entered by the circuit court in late 2008 and early 2009, Prince William County Commissioner in Chancery Robert J. Zelnick ("Commissioner Zelnick") held a proceeding from January 11-15, 2010, to address "only issues concerning enforceability" of the mechanics' liens. The issues of valuation and priority were "deferred to a subsequent hearing, if needed."

On May 31, 2011, Commissioner Zelnick filed his report. He found that:

- All necessary parties were made defendants in the Contractors' suits to enforce their mechanics' liens;
- Jack Bays did not violate the 90-day rule embodied in Code § 43-4;
- Jack Bays complied with the 150-day rule embodied in Code § 43-4;
- The other Contractors complied with the 150-day rule embodied in Code § 43-4;
- Jack Bays did not include charges for labor and materials prior to May 1, 2007;
- Jack Bays acted reasonably in waiting until September 28, 2007 to recommend ceasing current work on the New Life project, and therefore did not fail to mitigate damages;

8

- The mechanics' liens of Century Contracting, Adrian L. Merton, Scaffold Resource, Becker Electric, United Sprinkler, General Glass, Miller Construction, Structural Steel, Sparkle Painting, Virginia Paving, and Clover Contracting were valid and enforceable;
- Capital Contracting's mechanics' lien was extinguished;
- The liens of Samaha Associates, Loudoun Sheet Metal Company, and Phillip C. Clarke, Incorporated, were not enforceable;
- A priority of liens existed, with the subcontractors holding top priority, Jack Bays second priority, the Lenders third priority, and a September 2008 Jack Bays Deed of Trust and Trustee for General Mortgage Bondholders holding fourth priority; and
- The property should be sold to satisfy the outstanding liens.

On June 10, 2011, Citizens Business Bank, Celtic Bank, and Glasser & Glasser filed exceptions to the report. The Lenders filed a Joint Brief in Support of Exceptions to the report. Their exceptions primarily focus on the Commissioner's interpretation of Code § 43-4 concerning filing procedures and lien value. Additionally, the Lenders asserted that the Contractors failed to mitigate damages during their October 2007 work and that they also did not include necessary parties to their action to enforce the liens. Finally, the Lenders disputed the validity of some of the subcontractors' liens.

The circuit court issued a final order on November 18, 2011, rejecting the Lenders' arguments in their entirety. The circuit court incorporated its October 14, 2011 letter opinion

9

into its final order.  The circuit court further ordered that the property be sold at public auction to the highest bidder, with proceeds of the sale to be applied in satisfaction of the mechanics' liens in the order of priority established by Commissioner Zelnick.  Lenders timely filed notices of and petitions for appeal, raising fourteen assignments of error.  We awarded an appeal.

## II.  Analysis

### A.  Standard of Review

In their first assignment of error, the Lenders assert that "[t]he trial court lacked subject matter jurisdiction as necessary parties were not joined in any of the lawsuits which are the subject matter of this appeal."  This assignment involves a question of law and is reviewed de novo.  Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007).

For the remaining assignments of error, the Lenders challenge the circuit court's conclusion that Commissioner Zelnick properly determined issues related to the Contractors' liens.  "When a circuit court approves a report by a commissioner in chancery who heard evidence ore tenus, we will affirm the court's decree unless it is plainly wrong or without evidence to support it."  Amstutz v. Everett Jones Lumber Corp., 268 Va. 551, 558, 604 S.E.2d 437, 441 (2004)

(citing Shepherd v. Davis, 265 Va. 108, 117, 574 S.E.2d 514, 519 (2003); Snyder Plaza Props., Inc. v. Adams Outdoor Adver., Inc., 259 Va. 635, 641, 528 S.E.2d 452, 456 (2000)).  "[W]e look at the commissioner's conclusions, as approved by the circuit court, and determine whether the conclusions are supported by credible evidence."  Id. (citing Chaney v. Haynes, 250 Va. 155, 158, 458 S.E.2d 451, 453 (1995)); see also Code § 8.01-610.  However, this standard "is not applicable to pure conclusions of law contained in the report," which are reviewed de novo.  Hill v. Hill, 227 Va. 569, 577, 318 S.E.2d 292, 296 (1984) (citations omitted).

### B.   Necessary Parties

Suits to enforce mechanics' liens must name all necessary parties within the time set forth by Code § 43-17, and a failure to name a necessary party as defendant requires dismissal.  Mendenhall v. Douglas L. Cooper, Inc., 239 Va. 71, 72, 75, 387 S.E.2d 468, 469-70 (1990).

Citing James T. Bush Constr. Co. v. Patel, 243 Va. 84, 87-88, 412 S.E.2d 703, 704-05 (1992), the Lenders contend that "[i]n the context of mechanic[s'] lien litigation, necessary parties include the owner of the property, and both the trustee and beneficiaries of a deed of trust secured by the property."  The beneficiaries here, the Lenders assert, are the Bondholders under the Trust Indenture.  Because the

11

Contractors did not name the Bondholders, their suits must be dismissed, according to the Lenders.

The Contractors rejoin that this Court stated otherwise in Michael E. Siska Rev. Trust v. Milestone Development, LLC, 282 Va. 169, 181, 715 S.E.2d 21, 27 (2011), where we held that "the necessary party doctrine does not implicate subject matter jurisdiction." They also allege that "[p]arties filing mechanic[s'] liens are entitled to rely on the land records," citing Blue Ridge Constr. v. Stafford Dev. Grp., Ltd., 244 Va. 361, 365, 421 S.E.2d 199, 201 (1992) in support. The Contractors finally assert that Glasser & Glasser, as Trustee for the Bondholders, is in position to protect the Bondholders' interests.

In their Reply, the Lenders argue that Siska "does not address statutorily created causes of action such as mechanics' liens, or modify the clear line of authority of Bush v. Patel." The Lenders also claim that the rule concerning whether parties may rely on land records is not the law in Virginia, citing a 1956 case, Chavis v. Gibbs, 198 Va. 379, 94 S.E.2d 195, in support. Finally, the Lenders state in a footnote that "[the Contractors'] reliance upon the powers of the Trustee under the Trust Indenture to take action to prevent any impairment of the Trust Estate is misplaced as

12

they are no different in kind than the power any trustee has to take action to protect the Trust property."

In Siska, we stated that "the necessary party doctrine does not implicate subject matter jurisdiction. If the doctrine involved subject matter jurisdiction, the absence of a necessary party would, by definition, deprive the court of the power to render a decree. There could not logically be exceptions." 282 Va. at 177, 715 S.E.2d at 25. We observed that questions of personal jurisdiction and the ability to "render complete relief" guide the decision whether to exercise subject matter jurisdiction. Id.

However, Siska's rule is not applicable in the present, limited context. As "purely a creature of statute," Wallace v. Brumback, 177 Va. 36, 40, 12 S.E.2d 801, 802 (1941), a mechanics' lien must be "perfected within the proper time and in the proper manner, as outlined by the statute, [or] it is lost." American Standard Homes Corp. v. Reinecke, 245 Va. 113, 119, 425 S.E.2d 515, 518 (1993) (internal quotation marks omitted).

The Lenders are correct that both trustees and trust beneficiaries to a deed of trust are necessary parties to a mechanics' lien suit. See Bush, 243 Va. at 87, 412 S.E.2d at 704; Walt Robbins, 232 Va. at 47, 348 S.E.2d at 226. Although Bush did not concern the question whether a beneficiary of a

13

trust indenture was a necessary party, its principles remain clear: a party must name a beneficiary to the deed of trust because that beneficiary has "a substantial interest in being given the opportunity to challenge the validity of the mechanic[s'] lien, or otherwise to litigate the elements of the lien." 243 Va. at 88, 412 S.E.2d at 705. Because this purpose is fulfilled by the deed of trust beneficiaries, it follows that the beneficiaries of a trust indenture are not necessary parties. As a named beneficiary of the Deed of Trust and as a Trustee for the Bondholders, naming Glasser & Glasser is sufficient to comply with the requirements of Bush.

Also, we note that there is little evidence supporting the Lenders' contention that the Contractors were aware of the Bondholders' identity or that the Contractors could have inquired to determine it. The Trust Indenture states that Reliance Trust Company would maintain in Georgia a bond register containing names, addresses, bond numbers, and amounts of purchase of all issued bonds. However, Reliance had no obligation to keep the list accurate. ("[Reliance] shall be under no responsibility with regard to the accuracy of [the bond registration] list."). Nor could the Contractors have obtained the information on the list without the express written consent of another entity, California Plan of Church Finance, Inc. Even without regard to the Bush precedent, the

14

Contractors could not be expected to accurately ascertain the identity of bondholders under these circumstances. A rule to the contrary would render compliance with the statute effectively impossible.

### C.   Code § 43-4

#### 1.   The Ninety-Day Rule

In relevant part, Code § 43-4 provides:

> A general contractor, or any other lien claimant under §§ 43-7 and 43-9, in order to perfect the lien given by § 43-3, provided such lien has not been barred by § 43-4.01 C, shall file a memorandum of lien at any time after the work is commenced or material furnished, but not later than 90 days from the last day of the month in which he last performs labor or furnishes material, and in no event later than 90 days from the time such building, structure, or railroad is completed, or the work thereon otherwise terminated.

Therefore, each contractor had ninety days from the end of the last month in which it last performed labor or furnished material to file a lien, unless work on the church was complete or "otherwise terminated."

It is not disputed that as of the date of Jack Bays' September 28, 2007 letter, the church was incomplete. Nor is it disputed that Jack Bays recorded its lien on December 28, 2007. The Lenders allege that although work was not complete, Jack Bays' September 28 letter "otherwise terminated" work on the church, beginning the ninety-day filing limitation. If

this is true, then we must dismiss Jack Bays' suit: The difference between September 28 and December 28 is ninety-one days. If it is not, then Jack Bays earns the benefit of starting the ninety-day clock on the last day of September, two days later. Importantly, the difference between the last day in September and December 28 is eighty-eight days. Accordingly, in order for Jack Bays to have timely filed its lien, its letter of September 28, 2007, cannot have operated to "otherwise terminate[]" work on the church, as the Lenders insist.

The Lenders cite to Mills v. Moore's Super Stores, Inc., 217 Va. 276, 279, 227 S.E.2d 719, 722 (1976) and Northern Virginia Savings and Loan Ass'n v. J.B. Kendall Co., 205 Va. 136, 135 S.E.2d 178 (1964), in support of their argument. In the latter case, they allege, this Court found that a contractor's work had "otherwise terminated" when work on the project came to a "standstill" due to the property owner's lack of financing and the contractor's failure to provide labor or material to the job. See J.B. Kendall Co., 205 Va. at 147-48, 135 S.E.2d at 186. The Lenders conclude that J.B. Kendall Co. should apply here because work came to a standstill after September 28, 2007.

Jack Bays argues that September 30, 2007, is the proper date to use for the 90-day deadline imposed by Code § 43-4,

because the statute gives a claimant "90 days from the last day of the month in which he last performs labor or furnishes material."  Jack Bays claims that Virginia law on the matter is contrary to the Lenders' assertion; "the law provides that all activity must have come to an end in order for the work to be deemed terminated as of September 28, 2007[,] which plainly did not occur here."  See Mills, 217 Va. at 276, 227 S.E.2d at 719; J.B. Kendall Co., 205 Va. at 148, 135 S.E.2d at 187.

> The Commissioner concluded that
>
> [t]he Supreme Court has recognized that the 90-day time period "begins to run from the time the entire building is completed or work thereon is otherwise terminated, and not necessarily from the time the general contractor has completed his specific contract to furnish labor or materials, or both." [J.B. Kendall Co., 205 Va. at 144, 135 S.E.2d at 184].  In light of the uncontroverted fact that the building was never completed, and that several subcontractors, such as Becker Electric and Scaffold Resources, Inc. continued to work on the Project in October, 2008, your Commissioner finds that Jack Bays' lien does not violate the 90-day rule.

The circuit court "agree[d] with the Commissioner that the evidence established that Jack Bays properly used the last day of September, 2007, to begin calculating the ninety-day filing deadline."

We held in Mills that "otherwise terminated" under Code § 43-4 meant when work under the contract ceased.  217 Va. at 279, 227 S.E.2d at 722.  There, the contract ceased upon the

17

combination of several factors: financial difficulties encountered by the general contractor, uncontroverted evidence that neither the general contractor nor any subcontractors worked at the site after the termination date, and the owner's firing of the general contractor.  Id.  Here, unlike in Mills, work did not stop at the construction site; several subcontractors remained and performed contract work through October.  Jack Bays also terminated its involvement in May 2008.  Therefore, it cannot be said that "work [on the structure was] otherwise terminated" under Code § 43-4, and the circuit court was not plainly wrong in upholding the Commissioner's ruling that Jack Bays complied with the ninety-day rule.

## 2. The 150-day Rule

In relevant part, Code § 43-4 provides:

> The lien claimant may file any number of memoranda but no memorandum filed pursuant to this chapter shall include sums due for labor or materials furnished more than 150 days prior to the last day on which labor was performed or material furnished to the job preceding the filing of such memorandum.

Accordingly, whether Jack Bays offered sufficient proof to conform to the 150-day rule prescribed by Code § 43-4 is a factual inquiry.  If a claimant violates this rule, their mechanics' lien is unenforceable.  Carolina Builders Corp. v. Cenit Equity Co., 257 Va. 405, 411, 512 S.E.2d 550, 553 (1999).

18

### i. Does the Rule Provide for a Unitary Date Range for all Contractors?

The Lenders first claim that the 150-day rule has a unitary date range for all contractors.

As we stated in Carolina Builders, 257 Va. at 409, 512 S.E.2d at 551, the 150-day rule

> specifies that "[t]he lien claimant may file any number of memoranda but no memorandum . . . shall include sums due for labor or materials furnished more than 150 days prior to the last day on which labor was performed or material furnished to the job preceding the filing of such memorandum."

Id. (quoting Code § 43-4) (emphasis added);  see also Smith Mt. Bldg. Supply, LLC v. Windstar Props., LLC, 277 Va. 387, 390-91, 672 S.E.2d 845, 846 (2009).  The Lenders' argument that the 150-day rule does not apply separately for each claimant ignores the language of the statute, which plainly states that the period is calculated according to the actions of the lien claimant.  Code § 43-4.  Because time is calculated in this fashion, it cannot be "unitary" for all lien claimants.

### ii. Propriety of the September 28, 2007 End Date

The Lenders allege that, even if the 150-day rule is not unitary, Jack Bays failed to comply with the rule because it used the wrong end date, September 28, 2007, from which it looked back.  Because the circuit court agreed with

19

Commissioner Zelnick's conclusion that Jack Bays complied with the 150-day rule prescribed by Code § 43-4, the Lenders must show that the decision was plainly wrong or without evidence to support it. Amstutz, 268 Va. at 558, 604 S.E.2d at 441.

Jack Bays' Site Superintendent for the New Life project, Steven Wise ("Wise"), supervised the work site during the September-November 2007 period. The same day that Jack Bays informed its subcontractors to cease work via mail and fax, September 28, 2007, Wise began making phone calls to all subcontractors to inform them that, per instructions from Fuechsel, Jack Bays was "shut[ting active work on the project] down." The afternoon of September 28, 2007, Wise made no fewer than nine phone calls to various subcontractors, explaining to them that Jack Bays was "demobilizing" and that the subcontractors should not return to the work site the following week and that if they did so, it would be at their own risk.

Wise also vividly recounted his interaction with subcontractors and efforts related to Jack Bays' work at the site from October 1 through November 16, 2007, none of which work involved labor performed "to the job" – that is, construction of the church. Fuechsel's testimony supported Wise's account. The Lenders offered no controverting evidence, instead asserting that "value" was added to the

project through Jack Bays' labor after September 28, 2007, and that this added value precluded Jack Bays from using September 28 as the end point for purposes of the 150-day rule.

The Lenders' arguments to both Commissioner Zelnick and the circuit court on this issue were rejected. Although several subcontractors added value to the project after September 28, 2007, the Commissioner concluded that the same was not true for Jack Bays.

This Court "look[s] at the commissioner's conclusions, as approved by the circuit court, and determine[s] whether the conclusions are supported by credible evidence." Amstutz, 268 Va. at 558, 604 S.E.2d at 441. Whether Jack Bays showed it complied with the 150-day rule was a factual inquiry for Commissioner Zelnick to decide. Based on the testimony of Wise and Fuechsel, Jack Bays sufficiently demonstrated to the Commissioner and the circuit court that the last day it performed labor or furnished material to the job was September 28, 2007.

iii. Propriety of Fees Included in Jack Bays' Lien

Jack Bays must also show that it did not include in its lien "sums due for labor or materials furnished" before May 2, 2007, the date 150 days prior to September 28, 2007. Code § 43-4.

21

The Lenders argue that Jack Bays' lien is invalid because it includes sums for work performed prior to May 2, 2007, the beginning of the 150-day period.

First, the Lenders claim that

> [p]rior to May 1, 2007, Jack Bays had clearly not billed New Life for all of the work Miller Construction had performed to date. In the following months, Jack Bays' requisitions to New Life accounted for these previous shortcomings, and thus included sums attributable to work performed prior to May 1, 2007. Therefore, because the liens were based on these later billings, they too included sums for work done prior to May 1, 2007.

The Lenders offered the testimony of Thomas Chappell as an expert witness in construction accounting to support their argument before the Commissioner. Chappell testified that between December 2006 and April 2007 Miller Construction billed $424,624 to Jack Bays, and Jack Bays billed only $327,362 to New Life for work that Chappell believed was attributable to Miller Construction. Jack Bays subsequently charged New Life amounts varying from the monthly value invoiced to it by Miller Construction through July 2007. According to Chappell, Jack Bays' May 2007 billing

> appears to be a catch-up for the under-billing in the prior months which would mean that costs incurred, labor and materials incurred in the prior period are now being drawn into the May requisition by Jack Bays, which is also included as part of the basis for the mechanic[s'] lien.

22

It is true that Jack Bays invoiced New Life different values for masonry work – Miller Construction's job – than Miller Construction invoiced Jack Bays a month prior. Jack Bays argues that the discrepancy exists because it billed New Life under a stipulated sum agreement, rather than a cost-plus contract. Semon Samaha ("Samaha"), the project architect, described before the Commissioner the difference between the two billings:

> Well, the cost-plus is somewhat open-ended, I mean the contractor is providing a fee basically to do the work and then whatever costs are incurred plus that fee is what the owner pays, so part of the problem is trying to determine which cue [sic] the costs go in. And I know that one of the projects that we did a while back, there was a dispute, for example, about whether a saw that the contractor purchased should be part of the cost or part of the contractor's fee and whether it should have just been a rental charge, and so it becomes much more cumbersome, where a stipulated sum, the amount is agreed upon ahead of time and from then on, it's just based on how much of the work gets done as a percentage of that amount.

Chappell also acknowledged that differences exist between stipulated sum agreements and cost-plus agreements.

Fuechsel, who qualified before the Commissioner as an expert witness in commercial general contracting with a sub-specialty in new church construction, testified that requisitions were prepared around the 25th of each month and projected through the end of that month. Jack Bays

23

"reasonably assume[d]" progress made in various construction areas as compared to the prior billing period, with the percentage increase serving as the basis for the requisition. This process is consistent with the April '06 Agreement and the AIA A201-1997 General Conditions ("General Conditions") incorporated therein. Fuechsel testified that subcontractor billings were used to "confirm our percent complete at the time of each monthly invoice." Additionally, all requisitions were submitted to and approved by Samaha. Samaha could only approve requisitions for payment based on the value of work completed beyond the prior month's performance, not by a subcontractor's individual billing.

Commissioner Zelnick was persuaded by Jack Bays' argument, finding that its monthly requisitions "were not formulated based on costs incurred from the subcontractors and suppliers, but rather were the product of Jack Bays' reasonable estimation of the value added to the project with that billing period." He also found that Chappell's testimony was unpersuasive due to the differences between his testimony and the nature of a stipulated sum agreement. The circuit court reviewed and accepted these findings without qualification.

Whether Jack Bays proved that it did not include in its lien Miller Construction's sums due prior to May 1 was a

24

factual inquiry. Although the Lenders offered expert testimony and cross examined Jack Bays' witnesses regarding the relationship between subcontractor billings and Jack Bays' requisitions, the Commissioner found that Jack Bays did not include charges for Miller Construction's work in its lien. The circuit court accepted these findings. Based upon the record, we cannot say that these findings were plainly wrong or without evidence to support them.

The Lenders also argue that the trial court erred in its conclusion that no charges for labor or material provided before May 2, 2007, were included in Jack Bays' lien. Fuechsel testified regarding how Jack Bays calculated the proper value for the 150-day period between May 2, 2007, and September 28, 2007. This process involved using the requisitions from May to September to ascertain the value of the lien. However, because May 1, 2007, was included in the May requisition but was not validly part of the lien, Fuechsel stated that Jack Bays omitted this day from its calculation. The company did so by taking the total number of work days in May and dividing by the total amount invoiced to come up with a per-day value of labor performed or materials furnished, and then subtracted a per-day value in an effort to comply with Code § 43-4.

Referring to May 1, Fuechsel testified:

> Looking at the daily reports, there wasn't, you know, it was kind of business as usual, it wasn't a big delivery day, no major activities or unusual activities happened, so we took the number of work days in May, which was twenty-one, divided it into the total May invoice, and deleted what essentially mathematically came out to one day. . . .

Commissioner Zelnick found that testimony on this point was offered without contradiction. The circuit court concurred with his assessment. This factual determination was not plainly wrong or without evidence to support it.

Jack Bays sufficiently proved to both the Commissioner and the circuit court that it did not include sums due for labor provided or material furnished before May 2, 2007, nor did it perform labor or furnish material after September 28, 2007. Accordingly, we hold that Jack Bays properly perfected its lien under Code § 43-4.

It may appear inconsistent to use September 30, 2007, as the relevant date from which to analyze Jack Bays' compliance with Code § 43-4 for purposes of the 90-day calculation, and September 28, 2007, as the relevant date from which to analyze Jack Bays' compliance with Code § 43-4 for purposes of the 150-day calculation. These distinct dates are used because Code § 43-4 provides that in the circumstances presented by this case, the proper date to use when evaluating compliance with the 90-day rule is the _end_ of the relevant month where a

26

contractor last works on a structure, when that structure is not fully completed. The 150-day rule, on the other hand, requires that courts calculate time based on when the contractor last performs labor or furnishes material – not necessarily at the end of a month.

### 3. Duty to Mitigate

The Lenders contend that Jack Bays was obligated to mitigate its damages from May 25, 2007 onward, when New Life made its last payment to the contractor. The Lenders also argue that Jack Bays never requested assurances from New Life that payments would be forthcoming, and instead accrued millions in charges when it knew it would not receive payment.

Jack Bays notes that "[t]he failure to mitigate defense asserted by [the Lenders] apparently has never been applied in the mechanic[s'] lien context – the Lenders have been challenged to produce such authority, but it has never been forthcoming." It asserts that the defense is contractual in nature, and that the Lenders have no grounds to assert the mitigation defense because they were not parties to the contract. During oral argument, counsel for Jack Bays also argued that Code § 43-4 already contains a "mitigation-like" provision, the 150-day rule, which limits the fees a lien claimant may request. Finally, in the event the Lenders can

raise a mitigation defense, Jack Bays asserts that its actions were reasonable under the circumstances.

Assuming without deciding that the Lenders may raise the defense of failure to mitigate, Jack Bays took reasonable measures under the circumstances. Specifically, Jack Bays introduced during the Commissioner's hearing evidence stating that in July 2007 New Life was in "final approval for a $20,000,000.00 (Twenty Million Dollar) loan." It was also uncontroverted that Bishop Reeves told Fuechsel that New Life would pay for Jack Bays' prior, current, and future work in early August 2007, and if not then, shortly thereafter. When it became apparent that additional funding would not be obtained, Jack Bays acted promptly and decisively. The Commissioner and the trial court did not err in holding that Jack Bays properly mitigated its damages.

Accordingly, the circuit court was not plainly wrong in failing to rule that Jack Bays was required to mitigate its damages.

### 4. Subcontractor Liens

The Lenders argue that if this Court determines that work on the structure "otherwise terminated" on September 28, 2007, then Scaffold Resource, Becker Electric, and United Sprinkler were untimely in filing their liens on January 11, 22, and 29, 2008 respectively.

28

Because we find that the circuit court was not plainly wrong in concluding that work on the church did not terminate on September 28, 2007, and because we have held that the ninety-day deadline applies to each individual contractor, rather than the group collectively, <u>United Masonry Inc. of Va. v. Riggs Nat'l Bank of D.C.</u>, 233 Va. 476, 479, 357 S.E.2d 509, 511 (1987) ("the [ninety-day] filing deadline [is] dependent upon each contractor's own activity"), the validation of the mechanics' liens of Scaffold Resource, Becker Electric, and United Sprinkler was not plainly wrong or without evidence to support it.

D.   The Stipulation, Lien Priority, and Sale of Land

1. The Stipulation

The Lenders argue that at the January 2010 hearing before Commissioner Zelnick, "all parties stipulated, and the Commissioner ruled, that the hearing was confined to the issue of the enforceability of the liens, and all other issues of valuation and priority would be deferred to a subsequent hearing."  Relying on <u>Bauer v. Harn</u>, 223 Va. 31, 36, 286 S.E.2d 192, 194 (1982), they contend that "[s]tipulations are definitive of the issues" and are binding.  Unfortunately, the Lenders omit from their argument that the Commissioner's stipulation was contingent on future hearings being necessary.

29

The parties agreed that Commissioner Zelnick could address issues of priority and valuation at the January 2010 hearing, and that those issues would be "deferred to a subsequent hearing, if needed." The Commissioner reiterated the conditional nature of future hearings on priority and valuation by stating that a hearing on those matters would occur only if necessary. For this reason, the stipulation did not require that further hearings be held.

## 2. Lien Priority

The Lenders argue that no evidence concerning lien priority was submitted to Commissioner Zelnick during the five-day hearing. Consequently, they claim, the Commissioner and circuit court were plainly wrong in determining that the Contractors' liens had priority over the Lenders' Deed of Trust.

Jack Bays argues that evidence of lien priority was introduced. Various subcontractors claim that because Jack Bays commenced its contract work on the church before the Deed of Trust was recorded, "any mechanic[s'] liens arising out of that contract take priority over the Lenders' Deed of Trust."

Commissioner Zelnick reviewed the validity of the liens filed by each of the dozen-plus claimants and concluded that "the Claimants' liens, with the exception of the lien filed by Capital Contracting, are valid and enforceable, [and] have

priority over the . . . Deed of Trust."  The Commissioner reasoned that "[p]ursuant to Virginia Code § 43-23, there is no priority among mechanic[s'] liens, 'except that the lien of a subcontractor shall be preferred to that of his general contractor. . . .' "  Accordingly, the Commissioner gave priority to subcontractor liens over Jack Bays' lien, and gave priority to Jack Bays' lien over the Lenders' lien.  See Code § 43-23.

> In relevant part, Code § 43-21 states that

> [n]o lien or encumbrance upon the land created before the work was commenced or materials furnished shall operate upon the building or structure erected thereon, or materials furnished for and used in the same, until the lien in favor of the person doing the work or furnishing the materials shall have been satisfied; nor shall any lien or encumbrance upon the land created after the work was commenced or materials furnished operate on the land, or such building or structure, until the lien in favor of the person doing the work or furnishing the materials shall have been satisfied.

Of course, a "lien" or "encumbrance" upon land may include a deed of trust.  See Bayview Loan Servicing, LLC v. Simmons, 275 Va. 114, 119, 654 S.E.2d 898, 900 (2008); see also Woodington Electric, Inc. v. Lincoln Sav. & Loan Ass'n, 238 Va. 623, 630, 385 S.E.2d 872, 875 (1989) ("the mechanic[s'] lien 'leaps to the head of the class,' coming before virtually every other lien.").  With the possible exception of priority

31

concerning the land (discussed infra), the Commissioner was not plainly wrong or without evidence to support his determination concerning priority.

### 3. Sale of the Land

The Lenders also assert that, under Code § 43-3, a mechanics' lien applies only to " 'so much land therewith as shall be necessary for the convenient use and enjoyment thereof.' "  See Code § 43-3.  They maintain that there was "no basis for suggesting th[at] all of the land is necessary for the use and enjoyment of the improvements."  They argue that "[i]n the case of the property at issue, the uncompleted church sits on approximately 22 acres of land.  The uncompleted structure accounts for only 125,000 square feet (or 2.8 acres)."

Jack Bays suggests that objections to the sale of the entire parcel of land were not preserved.  At the hearing on exceptions to the Commissioner's report, counsel for Citizens Business Bank stated to the circuit court, "I don't see how the property can be sold at this point because it is clear from the record that the way the hearing proceeded, those issues were not determined, and by agreement they were not determined.  They were deferred."  The question of objection to the sale of the entire parcel was adequately preserved.

32

Because of the significant total sum of the mechanics' liens, Commissioner Zelnick determined that a sale of the land was necessary to satisfy the liens. See Code § 43-3. The Commissioner stated that proceeds remaining after the sale and satisfaction of the liens would be payable to New Life.

Code § 43-3(A) states as relevant here that

[a]ll persons performing labor or furnishing materials of the value of $150 or more, including the reasonable rental or use value of equipment, for the construction, removal, repair or improvement of any building or structure . . . shall have a lien . . . upon such building or structure, and so much land therewith as shall be necessary for the convenient use and enjoyment thereof.

(emphasis added).

Commissioner Zelnick recommended the sale of the twenty-two acre property because there were liens totaling approximately $32,360,000, and sale of the entire parcel was necessary to pay all of the liens. However, not all of these liens were mechanics' liens. Additionally, sale of the property to satisfy a mechanics' lien may only extend to "so much [of the] land therewith as shall be necessary for the convenient use and enjoyment thereof." Code § 43-3. The record does not reflect evidence presented on this question. Sale of the entire property may or may not be proper. Determination of this question may affect priority determination as it applies to the land.

33

III. Conclusion

For the reasons stated, we hold that on this record, Commissioner Zelnick and the circuit court erred in approving the sale of the entire parcel of land to satisfy the Contractors' liens, where no evidence was introduced to support this decision.  Accordingly, we will affirm in part and reverse in part the judgment of the circuit court and remand for further proceedings consistent with this opinion.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded</u>.